Beatrice HOUSTON, Debra H. Corothers, Brenda Armstrong, and Mildred Quarles on behalf of themselves and others similarly situated, Plaintiffs,

v.

Pat W. HALEY, Milton Starnes, Patricia C. Lamar, Pat Tatum, Ed Cardwell, Aldermen of the City of Oxford, and John O. Leslie, Mayor, City of Oxford, Defendants.

No. WC84–132–LS–D.

United States District Court, N.D. Mississippi, W.D.

May 21, 1987.

Alvin Chambliss, Jr., Oxford, Miss., for plaintiffs.

Edwin F. Perry, Oxford, Miss., for defendants.

## MEMORANDUM OPINION

SENTER, Chief Judge.

This action challenges the validity of the City of Oxford's plan to elect members to its board of aldermen, the body which governs the city. Plaintiffs allege that the proposed electoral scheme of electing four aldermen by single-member wards and one alderman at-large violates section 2 of the Voting Rights Act of 1965, as amended,

---

**21.** *See,* C. Stromberg & A. Stone, A Model State Law on Civil Commitment of the Mentally Ill, 20 Harv.J. on Legisl. 275.

particularly in view of the interpretation recently given to amended section 2 by the United States Supreme Court in *Thornburg v. Gingles*, 478 U.S. ——, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), and by the Court of Appeals for the Fifth Circuit in *United Latin American Citizens v. Midland Independent School Dist.*, 812 F.2d 1494 (5th Cir.1987), *aff'g*, 648 F.Supp. 596 (W.D.Tex.1986). This court conducted a two-day bench trial at which the parties presented testimony and other evidence. Upon review of the record in this case, the court is of the opinion that plaintiffs' challenge fails. The court will now proceed to make its findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## I. FINDINGS OF FACT.

According to the 1980 census, the population of the City of Oxford, Mississippi, is 9,882 persons, of whom 7,635 (77.3%) are white, 2,098 (21.2%) are black, and 149 (1.5%) are of other races. Defendants' Exhibit No. 11. The city is governed by a mayor-aldermen form of government. Pursuant to Miss.Code Ann. § 3374–36 (1942), which permits municipalities having a population of less than ten thousand to choose between two plans for electing aldermen,[1] the proper municipal authority chose to divide the City of Oxford into four wards, with one alderman to be selected from each ward and one alderman to be selected from the municipality at large for a total of five aldermen. Only one black individual has run for a position on the board of aldermen in Oxford, and no black has been elected to that post. No black individual has ever run for the position of mayor of the city.

The 1970 federal census erroneously indicated that the population of the City of Oxford was in excess of 10,000 persons.

Therefore, the city was required by state statute to abandon its ward system and implement an at-large electoral scheme. The first city election conducted under the at-large plan was held in 1973, and seven positions on the board of aldermen were available. One black individual, Nathan Hodges, campaigned for election to the board of aldermen. He came in eighth in a field of sixteen candidates, narrowly missing a seventh place finish and a seat on the board of aldermen by thirty-four votes.

The city subsequently learned the census data was flawed and the population of the city was in fact less than 10,000 persons. Therefore, pursuant to state statute, the city reverted to a ward system of electing aldermen. In the next municipal aldermen election in 1977, Nathan Hodges, a black, ran again for a position on the board, and he was defeated again. No black individual qualified for the next municipal election in 1981.

In January, 1984, after the data from the 1980 federal census had been gathered and compiled, the City of Oxford discovered that the existing four wards were malapportioned in violation of the one person-one vote doctrine.[2] The planning director for the city began work on a new plan for the 1985 municipal elections. A notice was published in the local newspaper on three occasions in February, 1984, advising the public that the board of aldermen would consider any proposals offered by the citizens. Such proposed plans had to be submitted by March 6, 1984. *See* Defendants' Exhibit No. 5. The city planner and the board of aldermen received no inquiries, proposals, or response from any member of the public. At the March 6, 1984, meeting of the board of aldermen, the planning

---

**1.** A three-judge court in *Stewart v. Waller*, 404 F.Supp. 206 (N.D.Miss.1975), declared Miss. Code Ann. § 21-3-7 (1972), the successor enactment to Miss.Code Ann. § 3374–36 (1942), to be null and void in its entirety and unconstitutional. The court further decreed that the statute law of the State of Mississippi as it existed prior to the passage of § 21-3-7 be given full force and effect as if it had never been repealed.

**2.** At that time, the four wards in Oxford were composed as follows:

| Ward | No. of Persons | % of Total Population |
|------|----------------|----------------------|
| 1 | 2,319 | 23.5 |
| 2 | 2,644 | 26.7 |
| 3 | 1,954 | 19.8 |
| 4 | 2,965 | 30.0 |
| | 9,882 | 100.0 |

The major differences in population were in Wards 3 and 4.

director for the city, Mr. Ben Smith, suggested to the board that the city implement a four-ward plan with the county courthouse at the center of a quadrant. This is near the intersection of Lamar Avenue and University Avenue, the two major streets in the city.

The ideal population of each of the four wards would be 2,470.5 persons, or 25% of the total population. The plan suggested by the director of planning was composed as follows:

| Ward | Population |
|------|-----------|
| 1 | 2,557 |
| 2 | 2,406 |
| 3 | 2,540 |
| 4 | 2,379 |
| | 9,882. |

The board of aldermen approved the plan and voted to submit it to the Justice Department for preclearance under section 5 of the Voting Rights Act. A city ordinance adopting the plan was not drafted or approved at that time, however. No one who attended that meeting opposed the plan.

At a meeting the next month, Mr. Alvin Chambliss, a local black attorney, appeared and objected to the plan. The board of aldermen granted him two weeks, or until April 17, to submit an alternative plan. On April 17, Chambliss requested and was granted until May 1 to submit an alternative plan. Chambliss did not appear at the May 1 meeting, and no alternative plan was submitted to the board of aldermen.

Upon request of the board, Smith, the director of city planning, prepared a second plan which coalesced black voting strength to the greatest extent possible under the four-ward, one at-large statutory scheme. He testified at trial that blacks in Oxford are scattered in small concentrations throughout the city rather than in the typical large, cohesive area. Nevertheless, Smith abandoned the traditional quadrant plan and developed a plan which connected the two largest concentrations of blacks: C.B. Webb townhouses and Eastview. The parties stipulated that this plan is the best possible plan that could be devised to maximize the black population and black voting strength under a four ward, one at-large system. No other plan could be devised which would maximize black voting strength and at the same time adhere to the one person-one vote principle. The plan was composed as follows:

| Ward | Population | Black |
|------|-----------|-------|
| 1 | 2,533 | 6.1% |
| 2 | 2,358 | 14.5% |
| 3 | 2,540 | 17.0% |
| 4 | 2,451 | 53.8% |

The board of aldermen approved this plan, *see* Defendants' Exhibit No. 2, and the plan was submitted to the Justice Department in July, 1984, for preclearance under section 5. The Justice Department filed no objections to this plan, *see* Defendants' Exhibit No. 14, and the plan was used in the 1985 municipal elections. *See* Defendants' Exhibit No. 15. Despite the 53.8% black district in Ward 4, no black person qualified to run for the board of aldermen in Ward 4 or in any other ward in the 1985 city election.

The planning director for the city was not requested to develop a five-ward plan, and no five-ward plan was submitted to the board of aldermen for consideration. This lawsuit was filed in July, 1984. In 1985 or 1986, in anticipation of plaintiffs' position in this lawsuit and at the behest of the attorney for the city, the city planning director addressed the feasibility of a five-ward electoral scheme. The parties have stipulated that a five single-member ward plan could result in one ward with a 65% black population.[3]

Plaintiffs initiated this lawsuit to challenge the at-large feature of the proposed

---

**3.** Plaintiffs posit anything less than a 65% black majority (ward) will fail to afford blacks an equal opportunity to participate in the electoral process and elect a candidate of their choice. This argument was rejected by the three-judge court in *Jordan v. Winter,* 604 F.Supp. 807 (N.D. Miss.), *aff'd sub nom. Mississippi Republican Executive Committee v. Brooks,* 469 U.S. 1002, 105 S.Ct. 416, 83 L.Ed.2d 343 (1984). In *Jordan,* a congressional district with a 58.30% black majority population was ordered. Subsequently, a black candidate defeated the incumbent white congressman, receiving 51.7% of the vote. Arguably, this is persuasive evidence that there is no static population requirement, applicable in all cases, that is necessary to afford minorities an equal opportunity to participate in the electoral process.

four ward, one at-large electoral scheme. They seek to have this court adjudicate that the at-large feature violates § 2 of the Voting Rights Act and that a plan implementing five single-member wards should be adopted.

## II. CONCLUSIONS OF LAW.

Jurisdiction is conferred on this court by 28 U.S.C. §§ 1331, 1343, 1344, 2201, and 2202.

A lengthy discussion on the history of section 2 of the Voting Rights Act is unnecessary. The court will leave that task to the commentators[4] and other courts.[5] It is sufficient here to state that subsection 2(a) prohibits all states and political subdivisions from imposing any voting qualifications or prerequisites to voting, or any standards, practices, or procedures which result in the denial or abridgment of the right to vote of any citizen who is a member of a protected class of racial and language minorities. Subsection 2(b) establishes that section 2 has been violated where the "totality of the circumstances" reveals that "the political processes leading to nomination or election ... are not equally open to participation by members of a [protected class] ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." While explaining that "[t]he extent to which members of a protected class have been elected to office in the state or political subdivision is one circumstance which may be considered" in evaluating an alleged violation, section 2(b) expressly provides that "nothing in [section 2] establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."

The Senate Report which accompanied the 1982 amendments elaborates on the nature of section 2 violations and on the proof required to establish these violations. The question under amended section 2 is whether "as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice." Amended section 2 was designed to restore the "results test"—the legal standard that governed voting discrimination cases prior to *Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). The "intent test" was repudiated. The Senate Report further specifies factors which typically may be relevant to a section 2 claim: (1) the history of voting-related discrimination in the state or political subdivision; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against single-shot voting; (4) the exclusion of members of the minority group from candidate slating processes; (5) the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; (6) the use of overt or subtle racial appeals in political campaigns; and (7) the extent to which members of the minority group have been elected to public office in the jurisdiction. The Report notes also that evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group and that the policy underlying the state's or the political subdivision's use of the contested practice or structure is tenuous may have probative value. The Report stresses, however, that this list of typical factors is neither comprehensive nor exclusive; other factors may also be relevant and may be considered. Furthermore, there is no requirement that any particular number of factors be proved or that a majority of

---

**4.** *E.g.,* Comment, *The Results Test of Amended Section 2 of the Voting Rights Act: An Examination of the Senate Report Factors,* 54 Miss.L.J. 289, 290–97 (1984).

**5.** *E.g., Jones v. City of Lubbock,* 727 F.2d 364, 372–80 (5th Cir.1984).

them point one way or the other. Rather, the Senate Report espouses a flexible, fact-intensive test of section 2 violations. Although the Court in *Thornburg* set forth a tripartite test to aid courts in determining whether a § 2 violation exists, the factors listed in the Senate Report are to be accorded appropriate weight. It is axiomatic that not all at-large voting plans violate § 2 and that all plans combining an at-large district with single-member districts do not violate § 2 of the Act. *See United Latin American Citizens*, 812 F.2d at 1502.

With these guidelines in mind, the court will proceed to examine the facts of this case. *See generally Wright v. City of Houston*, 806 F.2d 634, 635 (5th Cir.1986).

A. *Historical Discrimination.*

Since the earliest cases, historical discrimination has consistently been a critical factor in the determination of vote dilution. *See, e.g., White v. Regester*, 412 U.S. 755, 766, 768, 93 S.Ct. 2332, 2339, 2340–2341, 37 L.Ed.2d 314 (1973). This factor is listed first in both the Senate and House Reports, and the courts in every successful vote dilution claim involving amended section 2 have emphasized this factor.

In the instant case, this court took judicial notice of the fact that racial discrimination has historically existed in Mississippi and in the City of Oxford. The court took judicial notice of the same facts regarding historical discrimination as did the three-judge court in *Jordan v. Winter*, 604 F.Supp. 807, 811–12 (N.D.Miss.1984). That history has been often recounted in judicial decisions and includes the use of such discriminatory devices as poll taxes, literacy tests, residency requirements, white primaries, and the use of violence to intimidate blacks from registering to vote. The court in *Jordan* found, and this court now concurs, that the effects of historical official discrimination in Mississippi presently impede black voter registration and turnout.

B. *Racially Polarized Voting.*

▮ The results test of amended section 2 does not assume the existence of racial bloc voting; the plaintiffs must prove it. S.Rep. No. 417, 97th Cong., 2d Sess. 33, *reprinted in* 1982 Code Cong. &

Ad.News, p. 171; *Thornburg*, 478 U.S. at ——, 106 S.Ct. at 2764, 92 L.Ed.2d at 44. Racial polarization exists where there is a consistent relationship between the race of the voter and the way in which the voter votes, or to put it differently, where black voters and white voters vote differently. *Thornburg*, 478 U.S. at —— n. 20, 106 S.Ct. at 2768 n. 20, 92 L.Ed.2d at 48 n. 20. The Court in *Thornburg* stated that "the most important Senate Report factors bearing on § 2 challenges to multimember districts are the 'extent to which minority groups have been elected to public office in the jurisdiction' and the 'extent to which voting in the elections of the state or political subdivision is racially polarized.'" *Id.* at —— n. 15, 106 S.Ct. at 2766 n. 15, 92 L.Ed.2d at 45–46 n. 15. If present, the other factors are supportive of, but not essential to, a minority voter's claim. Consequently, if (a) difficulty in electing, and (b) white bloc voting are not proven, minority voters have not established that the challenged electoral structure interferes with their ability to elect their preferred candidates. *Id.* Minority voters may be able to prove that they still suffer social and economic effects of past discrimination, that appeals to racial bias are employed in election campaigns, and that a majority vote is required to win a seat, but they have not demonstrated a substantial inability to elect caused by the use of the challenged electoral scheme. *Id.* In sum, the minority must demonstrate that the white majority votes sufficiently as a bloc to enable it, in the absence of special circumstances, usually to defeat the minority's preferred candidate. *Id.* at ——, 106 S.Ct. at 2767, 92 L.Ed.2d at 47. As emphasized by the Court, the extent and degree of bloc voting will vary from district to district according to several factual circumstances.

The plaintiffs in the action *sub judice* had a problem in the outset in demonstrating racially polarized voting. Only one black person has ever qualified to run for mayor or the board of aldermen. As noted, Nathan Hodges, a black male, qualified and campaigned for a position on the board of

aldermen in the 1973 municipal elections. Due to an error in the census data, the city was functioning under an at-large system pursuant to state law. Seven positions on the board of aldermen were being filled in the 1973 election. Hodges received 1,112 votes in the first Democratic primary, good enough to be in a runoff with five other candidates for three positions. In the runoff election, Hodges received 1,215 votes. *See* Plaintiffs' Exhibit Nos. 3, 5 & 7. Although Hodges failed to win a seat, he garnered wide support from white voters. John Leslie, who was campaigning for the office of mayor in 1973, testified at trial that he estimated that only fifty blacks voted in that election.[6] Notwithstanding the meager black voter turnout, Hodges received in excess of 1,200 votes, which indicates that a lot of white citizens voted for the black candidate. Hodges lost the 1973 runoff by only thirty-four votes. He qualified and campaigned again in the 1977 municipal Democratic primary election. In that election, the voters were electing aldermen for four wards and a fifth alderman at large. Hodges campaigned for the at-large position and was opposed by three white candidates. He received 478 votes from a total of 2,168 votes cast and placed third in the balloting. *See* Plaintiffs' Exhibit Nos. 3, 5, & 7. Hodges' third-place finish was insufficient to propel him into the second primary or general election.

Hodges' two unsuccessful campaigns mark the extent of the involvement of blacks as candidates in municipal elections. Despite the city's creation of a ward in which blacks comprise 53.8% of the population, no black person qualified or campaigned for that seat on the board of aldermen in the 1985 municipal election.

The Court in *Thornburg* concluded that "a bloc voting majority must *usually* be able to defeat candidates supported by a politically cohesive, geographically insular minority group." *Thornburg*, 478 U.S. at ——, 106 S.Ct. at 2766, 92 L.Ed.2d at 46 (emphasis in original). The bloc voting referred to was that of white voters. Al-

though minorities also engage in bloc voting and good candidates will bring out crossover voting from members of both blocs, the voting which the court must consider is the white bloc. *See United Latin American Citizens*, 812 F.2d at 1499.

The 1973 City of Oxford municipal election establishes that although there was substantial white crossover voting for the black candidate, the white majority bloc was able to defeat him. Hodges campaigned again in the 1977 municipal election, but was defeated a second time.

The number of elections that must be studied in order to determine whether voting is polarized will vary according to pertinent circumstances. One important circumstance is the number of elections in which the minority group has sponsored candidates. Where a minority group has never been able to sponsor a candidate, courts must rely on other factors that tend to prove unequal access to the electoral process. Similarly, where a minority group has begun to sponsor candidates just recently, the fact that statistics from only one or a few elections are available for examination does not foreclose a vote dilution claim. *Thornburg*, 478 U.S. at —— & n. 25, 106 S.Ct. at 2770 & n. 25, 92 L.Ed.2d at 51 & n. 25.

The court concludes that the results of the 1973 city elections are not particularly pertinent since that election was not conducted under the four ward, one at-large electoral scheme which is being challenged in this lawsuit. Plaintiffs failed to submit any data or statistics on the presence or absence of crossover voting in the 1977 municipal election. The only evidence submitted regarding the 1977 election is the stipulated fact that Hodges, the black candidate, was defeated by a white candidate. The remoteness in time of those two elections lessens any significance they may have.

In sum, the court is of the opinion that plaintiffs have failed to establish that whites in the City of Oxford sufficiently vote as a bloc *usually* to defeat a minority

---

**6.** Leslie stated that he stood in front of city hall from the time the polls opened at 7:00 A.M. until they closed at 6:00 P.M., taking approximately forty-five minutes for lunch.

candidate for alderman. The proof does not demonstrate legally significant racial bloc voting in City of Oxford municipal elections. The court further concludes that plaintiffs have failed to submit sufficient evidence of other factors that tend to prove unequal access to the electoral process. *See Thornburg,* 478 U.S. at —— & n. 25, 106 S.Ct. at 2770 & n. 25, 92 L.Ed.2d at 51 & n. 25.

In view of the unusually low rate of black candidate participation in municipal elections, the court looks to white candidates who were supported by the black community. Plaintiffs utterly failed, however, to submit any evidence of white candidates who were supported by blacks and any racially polarized voting which accompanied such an election. There is absolutely no evidence in the record to show racially polarized voting in an election where one white candidate defeated another white candidate who was supported by blacks in Oxford. There is also no evidence of the election of any candidate who was opposed by the black community.

In view of the low rate of black candidate participation in municipal aldermanic campaigns, the remoteness in time of the 1973 and 1977 elections, and the difference in the types of electoral schemes involved, this court must conclude that the plaintiffs have failed to carry their burden of demonstrating this significant factor.

### C. *Denial of Access to a Candidate Slating Process.*

This factor, in some situations, could be of paramount importance. *United States v. Marengo County Comm'n.,* 731 F.2d 1546, 1569 (11th Cir.1984). There was no testimony or other evidence presented to the court, however, to indicate that a candidate slating process exists in the City of Oxford. Furthermore, the court has been presented with no evidence showing that racial discrimination prevents minority candidates from actively seeking white votes

and support. *See id.* at n. 40 (citations omitted).

### D. *Effects of Discrimination in Education, Employment, and Health.*

Past discrimination has been found to produce lingering effects in the form of disparate education, employment, income levels, and living conditions which adversely affect minority political participation. S.Rep. No. 417, 97th Cong., 2d Sess. 29 n. 114, *reprinted in* 1982 U.S.Code Cong. & Ad.News 177, 207. Debra Wilson, a plaintiff herein,[7] finished high school at Oxford High School. She subsequently attended three junior colleges but did not graduate. She currently works as a housekeeper and is unable to find other gainful employment. She testified that blacks in Oxford are not educated as well as whites because blacks are unable to repay loans made for post-high school education. Her education did not cause her plight in Oxford to improve. Although she has applied for numerous jobs, she has never received any responses.

Wilson has a child who is enrolled in the first grade in the Oxford public schools. This child has been in the legal custody of Wilson's sister and her husband, Alan Jones, for the past four-to-five years. The child is very talented and intelligent. Due to a mistake when she first enrolled in the first grade, the child was not placed in the class with other high achievers. She was retested, however, and made the highest score of any female student who took the test. She thereafter joined the class of high achievers, and she remains in that class. Alan Jones, who has legal custody of the child, is very pleased with the Oxford school system. The mayor of Oxford, John Leslie, also testified that the Oxford city school system is one of the best in the State of Mississippi. There is no significant private school influence in the city or county.

Louis Armstrong, expert witness for the plaintiffs, testified that there is a significant disparity between the education of whites and blacks in Oxford. For example,

---

**7.** This plaintiff is named in the complaint as Debra H. Corothers. Her name has changed

since the filing of the complaint.

of the 908 blacks surveyed in the most recent federal census, 509 (56.1%) had completed only elementary school (0–8 years). In stark contrast, 9.1% of the whites surveyed had gone no further than elementary school (0–8 years). Plaintiffs' Exhibit No. 3, pp. 26–234. Of the 908 blacks surveyed, 172 (18.9%) had completed only four years of high school, whereas 945 (23.6%) of the whites had gone no further than high school. *Id.* Armstrong further observed that in the City of Oxford, only 5.5% of the blacks surveyed had attained four or more years of college in contrast to 43.7% of the whites surveyed. *Id.* Armstrong was of the opinion that these numbers, compiled by the federal Bureau of the Census, indicate a significant disparity in education.

Armstrong also examined employment statistics for the City of Oxford. Again relying on numbers provided by the federal Bureau of the Census, he stated that blacks comprise a significant number of the lower paying jobs in the city. He also observed, for example, that there are 385 whites and *no blacks in sales occupations.* Plaintiffs' Exhibit No. 3, pp. 26–234. Armstrong stated that the significant disparity in white and black employment is consistent with the national average. Plaintiff Wilson testified that black businesses, other than barber shops and funeral homes, do not do very well economically.

Armstrong also observed a significant disparity in the per capita income of blacks and whites. According to information gathered and provided by the Federal Bureau of the Census, black per capita income in the City of Oxford was $2,947, whereas white per capita income was $6,890. Plaintiffs' Exhibit No. 3, pp. 26–244. Median income for black families was $9,731 compared with $20,103 for that of white families, and mean income for black families was $10,857 compared with $23,751 for that of white families. *Id.*

Mayor John Leslie testified that the fire department and police department are in excess of 20–21% black and have been for eight years. The police chief is white; however, there has been only one chief since Leslie has been in Oxford. There are four captains in the police department; although currently none are black, there have been black captains in the past. There is one black lieutenant out of an unspecified number of lieutenants. The lowest rank in the police department is patrolman; most blacks employed by the police department are patrolmen. The fire chief and assistant fire chief are both white. Leslie had no personal knowledge of the racial composition of the rest of the employees of the fire department.

Virginia Chrestman, the city clerk and tax collector, testified that the City of Oxford has employed workers with the racial composition as follows:

| Full-time | Race and Sex | Part-time |
|---|---|---|
| | **1984** | |
| 91 | White males | 12 |
| 34 | Black males | 12 |
| 19 | White females | 11 |
| 5 | Black females | 6 |
| 149 | | 41 |
| | **1985** | |
| 94 | White males | 15 |
| 34 | Black males | 12 |
| 17 | White females | 12 |
| 6 | Black females | 6 |
| 151 | | 45 |
| | **As of June 30, 1986** | |
| 103 | White males | 17 |
| 39 | Black males | 13 |
| 18 | White females | 12 |
| 6 | Black females | 5 |
| 166 | | 47 |

Blacks comprised 26.5% of the city work force in 1985 and 27.1% of the city work force in 1986. Of the fifteen employees added from 1985 to 1986, five (33.3%) were black. Alan Jones, a black male, has served as director of parks and recreation since 1981. He supervises fourteen full-time and nineteen part-time employees, and his assistant is black. Donna Wortham, a black female, is the municipal clerk.

Mayor Leslie further testified that although Oxford could always use additional jobs, the issue is race-neutral; persons of all races need jobs.

The testimony and evidence regarding the health of minorities were sparse. Plaintiff Beatrice Houston resides in the C.B. Webb townhouses, a predominantly

black, government subsidized housing area in Oxford. She testified that the health of blacks who live there is fair. Plaintiff Wilson went to the local hospital on one occasion, but the testimony was unclear whether or not she was treated. She testified that the health problems in Eastview, a predominantly black area of the city, are serious and that teenage pregnancy is a problem. Mayor Leslie testified that the local hospital and health system are available to everyone regardless of race.

### E. Campaigns Characterized by Racial Appeals.

There was no testimony or other evidence presented to the court indicating that the city has experienced campaigns characterized by racial appeals. Mayor John Leslie, a veteran of four successful campaigns, testified that there were no racial appeals in the elections in which he participated. Debra Wilson, whose father Nathan Hodges is the only black who has sought elective office in the city, testified that she never heard her father called any derogatory names during his two unsuccessful campaigns. Although Hodges was not invited to speak in any white churches, Mayor Leslie testified that he has never been invited to any church, black or white, to speak during his candidacy for mayor, although he has attended on other occasions. Furthermore, the plaintiffs have presented no evidence from which the court could infer racial appeals. See Marengo County, 731 F.2d at 1571.

### F. Number of Minority Elected Officials.

The extent to which minorities have been elected to office is another significant factor used to assess the dilutionary effect of an electoral scheme. The text of section 2 expressly states, however, that proportional representation is not required.

It is undisputed in the action sub judice that no black has ever served as mayor or on the board of aldermen of the City of Oxford, Mississippi.

### G. Lack of Responsiveness to Minority Needs.

This factor is accorded less significance and legal weight under section 2's results

standard than under the intent standard. Plaintiffs need not establish a lack of responsiveness to succeed in a dilution claim; a showing of unresponsiveness, however, may strengthen such a claim. See Marengo County, 731 F.2d at 1572. The Court of Appeals for the Fifth Circuit has found it appropriate to weigh the effects of federal funding, minority protests or demonstrations, and the specter of litigation in considering a city's responsiveness to minority interests. See Jones v. City of Lubbock, 727 F.2d 364, 381–82 & n. 14 (5th Cir.1984).

As noted, the black citizens of Oxford generally are concentrated in scattered pockets of the city. Plaintiff Debra Wilson lives in Eastview, a government-subsidized housing project. Of the 150 persons who live there, there are only two white families. Most of the residents of Eastview subsist on government welfare. She admitted that the city has provided a swimming pool, baseball and softball fields, a gym, tennis courts, and a recreation center in an area of town that is predominantly black. This testimony is consistent with that of Ben Smith, the city's director of planning. He testified that the city converted a garbage dump into the area now served by tennis courts, baseball fields, and the indoor recreation center. The swimming pool was constructed at a cost of $350,000–$400,000.

Plaintiff Beatrice Houston is unemployed and resides at the C.B. Webb townhouses, another government-subsidized housing project that is predominantly black. Most of the residents of C.B. Webb are unemployed and receive government subsidies. She admitted on cross-examination that C.B. Webb and Eastview homes are much nicer than the homes those residents had prior to the time they were built. Houston further testified that she has been to three or four meetings of the board of aldermen to request lights at a local park. The city granted the request and installed lights. She further made the statement that she was unaware of anything that the current aldermen have done to make life for blacks in Oxford unpleasant.

The director of city planning, Ben Smith, testified about the city's willingness to seek and use federal grants to upgrade the predominantly black areas of the city. The City of Oxford, for example, received a grant from the Department of Housing and Urban Development (HUD) to build a water system, a sewer system, and a park, and to rebuild streets in the Price Hill area of town. Upon receipt of another grant, the city transformed a blighted slum area into an area for low and moderate income families. One small area of town is still blighted, but the city is in the process of acquiring the dilapidated houses, most of which are vacant, and replacing them with standard housing. Smith testified that the city has provided, through federal grants, 300–350 housing units. The City of Oxford has about 99% standard housing. The total amount of money spent by the city to benefit low and moderate income people is approximately $15,000,000. Significantly, the Jackson Avenue project, C.B. Webb townhouses, and Eastview homes were already in existence at the time litigation began. *Pegues v. The City of Oxford*, No. WC 77–44 (N.D.Miss.), was a lawsuit pertaining to the funds spent on the housing in the Bonnie Branch Project. The parties entered into a consent decree which called for the paving of certain streets and the construction of parks and a swimming pool in black neighborhoods. Such development, according to Smith, was not entirely the result of the lawsuit. Smith admitted that there remain some areas in Oxford that are racially identifiable.

Blacks serve on all city boards with the sole exception of the hospital board. Of the five members of the school board, three are appointed by the board of aldermen and two are elected by the citizens. Of the three who are appointed by the board, one is black and two are white. Thus, 20% of the school board is comprised of blacks, a figure which compares favorably with the proportion of blacks in the general population.[8] All of the members of the Oxford Park Commission are appointed, and that board contains one or two blacks. As noted, the head of the department of parks and recreation is black, as is his assistant. Two of the five members of the Oxford Housing Authority are black. There is one black among the seven members of the Oxford Planning Commission. The Oxford Election Commission consists of one black and two whites. The hospital board consists of five white members and no black member. The city and the county are both granted two independent appointments to the hospital board, and they must agree on a fifth member. Blacks in the community sought to have a particular black appointed to the hospital board, but that individual resided in another county. The Industrial Foundation Board is an arm of the Chamber of Commerce which tries to attract industry to the area. The city does not operate this board, but does contribute money to it and appoints one member to its board. The city has had occasion to appoint only one person to that board throughout the existence of that board. Furthermore, a black male was recently elected to the board of directors of the Oxford Chamber of Commerce.

Patricia Lamar is in her second term as an alderman for Ward 3 in Oxford. Ward 3 is an integrated ward, and Lamar campaigned door-to-door in black and white neighborhoods. She receives telephone calls from black constituents and they regularly discuss problems together. Plaintiff Wilson, on the other hand, testified that she (Wilson) never even attempts to call her alderman about problems she is having.

The court is of the opinion that the evidence overwhelmingly proves that the City of Oxford has been and is still responsive to the needs of the black citizens. The plaintiffs have presented the court with no evidence from which the court could infer unresponsiveness.

### H. *Tenuousness of Policy Underlying the Electoral System.*

The strength of a given political jurisdiction's policy in favor of a particular elector-

---

**8.** Although amended section 2 expressly disapproves of proportional representation, comparisons involving the proportion of minorities in the community are inevitable and are often helpful.

al scheme is admittedly a more relevant consideration under the intent standard than under the results standard of section 2. *See Marengo County*, 731 F.2d at 1571. However, the strength of the underlying policy is still relevant because a finding of discriminatory intent may provide circumstantial evidence that the particular electoral device produces discriminatory results. Furthermore, a tenuous justification for a policy may also indicate that the policy itself is unfair.

The City of Oxford has conducted aldermanic elections under the ward system for as long as anyone can remember. The 1970 federal census revealed, however, that the city's population was in excess of 10,000 persons. Thus, according to then-existing state law, the city was required to elect aldermen at-large. The 1973 municipal elections were conducted at-large. The census data was subsequently found to be erroneous. The city discovered that it had less than 10,000 inhabitants. Thus, pursuant to state statute, the city reverted to its historical and traditional system of electing aldermen by wards. The city has conducted all elections by wards since that time.

The court finds that the policy of electing aldermen by wards is not tenuous but, rather, is mandated by state statute. The city has not departed from its historical electoral scheme, except briefly in the 1970's and then only as the result of erroneous data supplied by the federal census bureau, and such change was pursuant to state law. Although the courts and the legislative history of amended section 2 have indicated that this factor's importance has been diminished under the results test, this court finds in the action *sub judice* that the city's policy is not tenuous.

### I. *Voting Practices and Procedures Which Enhance the Opportunity for Discrimination.*

The parties have stipulated that candidates in city elections must win by a major-

ity vote or else be required to participate in a second primary. Single-shot voting is prohibited,[9] and there is no ward residency requirement for at-large candidates. As noted, there are no large concentrations of blacks in the city; rather, the black citizens are scattered in small concentrations throughout the city. The parties have stipulated that the existing four ward—one at-large system maximized black voting strength and connects the two largest black areas available without violating the one person—one vote principle. The ward lines do not separate cohesive neighborhoods, and the districts are not unusually large. Unusually large districts potentially enhance the lack of access by minorities by requiring more expensive campaigns to win. Although the testimony at trial was conflicting as to the amount of funds necessary to win a campaign, the court is of the opinion that the small population of the wards and the ability of candidates to campaign door-to-door, *see* testimony of Patricia Lamar, preclude a finding that the size or shape of the wards denies blacks access to participation in the electoral process. Virginia Chrestman, the city clerk and tax collector, testified that she was aware of no problems with anyone, black or white, registering to vote in the city in her thirteen year tenure. Plaintiff Wilson testified that she once had a problem voting but that it was in a county election. She has not had a problem in any city election. The city has abandoned the dual registration requirement, that is, requiring citizens to register in one place for city elections and in another place for county elections. The problems involved in "stacking" are not present in the action *sub judice* because of the low percentage of blacks in the city's population, and plaintiffs have not raised the issue. Because the court has concluded above that plaintiffs have failed to prove racial bloc voting, the court is unable to

---

**9.** Single-shot (bullet) voting was recently described by the Supreme Court in *Thornburg.* This technique enables a minority group to win some at-large seats if it concentrates its vote behind a limited number of candidates and if the vote of the majority is divided among a

number of candidates. *Thornburg,* 478 U.S. at —— n. 5, 106 S.Ct. at 2760 n. 5, 92 L.Ed.2d at 39 n. 5 (quoting *City of Rome v. United States,* 446 U.S. 156, 184 n. 19, 100 S.Ct. 1548, 1565 n. 19, 64 L.Ed.2d 119 (1980)).

infer other election practices which would enhance the opportunity for discrimination.

## III.  TRIPARTITE TEST.

Although the factors set forth by the Senate are relevant, the Court in *Thornburg* stated that for a violation of § 2 to be present, there must be a conjunction of three factors.  First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.  Second, the minority group must be able to show that it is politically cohesive.  If the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests.  Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it, in the absence of special circumstances, to defeat the minority's preferred candidate.  Succinctly stated, the bloc-voting majority must usually be able to defeat candidates supported by a politically cohesive, geographically insular minority group. *Thornburg*, 478 U.S. at ——, 106 S.Ct. at 2767, 92 L.Ed.2d at 47.

### A.

As noted, blacks comprise 21.2% of the population of the City of Oxford.  They are scattered in small concentrations throughout the city rather than in a large, geographically compact area.  The parties have stipulated, however, that a plan whereby all five aldermen would be elected from single-member wards could result in one ward with a 65% black population.  The proposed plan results in one ward with a 53.8% black majority.

Accordingly, the court concludes that plaintiffs have demonstrated that the black population in the City of Oxford is sufficiently large and geographically compact to constitute a majority under a five single-member district plan.

### B.

The minority group must also be able to show that it is politically cohesive. *See League of Latin American Citizens v. Midland Independent School Dist.*, 648 F.Supp. 596, 606–07 (W.D.Tex.1986), *aff'd*, 812 F.2d 1494 (5th Cir.1987).

Plaintiffs in the action *sub judice* failed to introduce any evidence that the black residents of Oxford are a politically cohesive group.  The record is barren of any evidence from which the court could conclude that blacks in the City of Oxford form such a cohesive group.

Accordingly, the court concludes that plaintiffs have failed to carry their burden on this prong of the tripartite test.

### C.

The third prong of the *Thornburg* test requires the minority to demonstrate that the white majority votes sufficiently as a bloc to usually enable it, in the absence of special circumstances, to defeat the minority's preferred candidate.

The evidence shows that Nathan Hodges, a black male, qualified and campaigned for a position on the board of aldermen in 1973 when the city was operating under an at-large electoral scheme.  Although only approximately 50 black citizens cast ballots in that election, Hodges received in excess of 1,200 votes.  Nevertheless, he lost the election by a slim margin.

The question in such a case is not whether blacks as blacks can produce enough votes to elect a black to the board of aldermen.  The crucial question is whether in the City of Oxford, Mississippi, white citizens, voting as a bloc for a white, will usually defeat a minority candidate for alderman. *See United Latin American Citizens*, 812 F.2d at 1502.  Although there is no doubt that blacks also engage in bloc voting and that a good candidate will bring out crossover voting from members of both blocs, the bloc voting of which the court takes notice is the white bloc. *Id.* at 1499 (footnote omitted).

The 1973 city election establishes that although there was substantial white crossover voting for the black candidate, Hodges, the white majority was able to defeat him.  Hodges campaigned again in the 1977 city election, but was defeated a second time by a white candidate.

Although the 1973 and 1977 municipal elections indicate that white citizens voted as a bloc to defeat the minority candidate, the court is of the opinion that these two elections are too remote in time to establish that whites voting as a bloc are *usually* able to defeat minority candidates. The court further concludes that the 1973 election results are not particularly relevant since that election was not conducted under the four ward, one at-large electoral scheme which plaintiffs are challenging in this lawsuit. In other words, the court finds insufficient evidence to establish that the proposed four ward, one at-large plan results in legally significant racial bloc voting. The 1977 election in which Hodges suffered defeat occurred a decade before this suit reached trial. No black citizen qualified or campaigned for a position on the board of aldermen in the 1981 or 1985 municipal elections despite the fact that the 1985 election was conducted under the four ward, one at-large plan wherein one of the wards contained a majority black population. In light of the sparse participation by black candidates in City of Oxford municipal elections conducted under the scheme being challenged herein, the court concludes that plaintiffs have failed to establish that whites in the City of Oxford sufficiently vote in a bloc *usually* to defeat a minority candidate for alderman. Legally significant racial bloc voting has not been shown to exist in Oxford municipal elections. The court further concludes that plaintiffs have failed to submit sufficient evidence of other factors that could prove unequal access to the electoral process. *See Thornburg*, 478 U.S. at ——, n. 25, 106 S.Ct. at 2760 n. 25, 92 L.Ed.2d at 51 & n. 25.

## IV. CONCLUSION.

Section 2 of the Voting Rights Act has been violated where the totality of the circumstances reveals that the political processes are not equally open to participation by members of a protected class. This court has examined the factors relevant in this peculiar situation and concludes that plaintiffs have failed to carry their burden. Although plaintiffs have demonstrated— and it is undisputed—that no blacks have been elected mayor or to the board of aldermen in Oxford, plaintiffs have failed to demonstrate the other "most important factor" of legally significant racially polarized voting in municipal elections. Although a black candidate was defeated in two municipal elections, plaintiffs have failed to show that the bloc voting by white citizens is legally significant. The court took judicial notice of the extent and degree of historical discrimination. The plaintiffs also persuaded the court that there is a significant disparity between whites and blacks in terms of education, employment, and income. The evidence on the health of blacks was unpersuasive because of the lack of expert testimony on the subject and the sparcity of evidence presented. There is no evidence of a candidate slating process in the City of Oxford nor evidence of campaigns characterized by racial appeals. The court also concludes that the city has done an outstanding job in responding to the particularized needs of the black community and that the policy underlying the city's use of this electoral scheme is not tenuous, realizing, of course, that these two factors are accorded less significance under the results standard of amended section 2. The court has also considered the voting practices and procedures used by the city that tend to enhance the opportunity for discrimination against blacks, as well as other factors not listed in the Senate Report.

Although other courts have struck down electoral schemes which contain part single-member districts and part at-large representation, *e.g.*, *Dillard v. Crenshaw County*, 649 F.Supp. 289 (M.D.Ala.1986), each case depends upon the unique facts present in the municipality. Considering the totality of the circumstances, the court is of the opinion that plaintiffs have failed to carry their burden of showing that the four ward, one at-large plan currently being utilized by the City of Oxford dilutes black voting strength or denies blacks equal access to the political processes in violation of section 2 of the Voting Rights Act, as amended.

A judgment in conformance with this opinion shall issue.

## JUDGMENT

Pursuant to a Memorandum Opinion this day rendered, it is hereby ORDERED:

The court finds for the defendants. This case is dismissed with prejudice. Plaintiffs are taxed with all costs.