## NOVEMBER 13, 1984

No. 83–1722. MISSISSIPPI REPUBLICAN EXECUTIVE COMMITTEE v. BROOKS ET AL.;
No. 83–1865. BROOKS ET AL. v. ALLAIN, GOVERNOR OF MISSISSIPPI, ET AL.; and
No. 83–2053. ALLAIN, GOVERNOR OF MISSISSIPPI, ET AL. v. BROOKS ET AL. Affirmed on appeals from D. C. N. D. Miss. Reported below: 604 F. Supp. 807.

JUSTICE STEVENS, concurring.

Although I agree that a summary affirmance of the judgment of the District Court is entirely appropriate in these cases, what has been written in dissent prompts me to make two important points.

First, there is little, if any, resemblance between the argument advanced in the dissenting opinion and the specific questions presented in the parties' jurisdictional statements. This Court has determined that summary affirmances "reject the specific challenges presented in the statement of jurisdiction." *Mandel* v. *Bradley*, 432 U. S. 173, 176 (1977). The only questions presented

in the jurisdictional statement that the Mississippi Republican Executive Committee filed in case No. 83–1722 read as follows:

> "1. Whether Section 5 and Section 2 as amended apply to redistricting decisions.
>
> "2. Whether the amendment to Section 2 or any other portion of the Voting Rights Amendments of 1982 has any bearing upon litigation under Section 5.
>
> "3. Whether Section 2 as amended prohibits only those electoral schemes intentionally designed or maintained to discriminate on the basis of race.
>
> "4. Whether Section 2, if construed to prohibit anything other than intentional discrimination on the basis of race in registration and voting, exceeds the power vested in Congress by the Fifteenth Amendment." Juris. Statement in No. 83–1722, p. i.[1]

Second, the dissent does not fairly characterize the opinion of the District Court. That opinion does not "in effect" construe the recent amendment to § 2 of the Voting Rights Act of 1965, 96 Stat. 134, 42 U. S. C. § 1973, as entitling "minority plaintiffs, in a State where there exist present effects from past discrimination, to have a state redistricting plan invalidated if it fails to provide at least one district in which the 'minority' is a majority of the eligible voters." *Post*, at 1005. The dissent buttresses this incorrect impression by attributing the following statement to the District Court:

> "The District Court felt it was obligated, under the 1982 amendments to the Voting Rights Act, to redraw the district map so that the redefined Second District would have a 'clear black voting age population majority of 52.83 percent.'" *Post*, at 1008.

---

[1] The jurisdictional statement that William A. Allain and others filed in No. 83–2053 presents two questions that are similar to those presented in No. 83–1722 and also presents the question whether the District Court erroneously found as a fact that black persons in Mississippi—and especially in the Delta generally—have less education, lower incomes, and more menial occupations than white persons, and that there has been racially polarized voting in Mississippi. See n. 2, *infra*. Nothing in the dissenting opinion indicates that it believes these questions merit full briefing and argument. In my judgment the jurisdictional statement in No. 83–1865 raises a more serious question, but I do not understand that the dissenting opinion favors review of that question.

What the District Court actually said was this:

> "In the opinion of this court, after considering the totality of the circumstances, the creation of a Second District with a clear black voting age population majority of 52.83% is sufficient to overcome the effects of past discrimination and racial bloc voting and will provide a fair and equal contest to all voters who may participate in congressional elections." App. to Motion to Dismiss or Affirm in No. 83–1722, p. 14a.

The District Court's conclusion that its remedy was required was not based on any notion that the law gives every minority group an entitlement to some form of proportional representation. Its conclusion was quite the contrary. It rested on specific findings of fact describing the impairment—or "dilution" if you will— of the voting strength of the black minority in Mississippi. Those factual findings reveal that Mississippi has a long history of *de jure* and *de facto* race discrimination,[2] that racial bloc voting is

---

[2] Regarding past discrimination, the District Court carefully found that Mississippi had often used poll taxes, literacy tests, residency requirements, white primaries, and violence to intimidate black persons from registering to vote. More importantly, the court found "that the effects of the historical official discrimination in Mississippi presently impede black voter registration and turnout." App. to Motion to Dismiss or Affirm in No. 83–1722, p. 9a. Additionally, the court wrote:

"Black registration in the Delta area is still disproportionately lower than white registration. No black has been elected to Congress since the Reconstruction period, and none has been elected to statewide office in this century. Blacks hold less than ten percent of all elective offices in Mississippi, though they constitute .35% of the state's population and a majority of the population of 22 counties.

"The evidence of socio-economic disparities between blacks and whites in the Delta area and the state as a whole is also probative of minorities' unequal access to the political process in Mississippi. Blacks in Mississippi, especially in the Delta region, generally have less education, lower incomes, and more menial occupations than whites. The State of Mississippi has a history of segregated school systems that provided inferior education to blacks. . . . Census statistics indicate lingering effects of past discrimination: the median family income in the Delta region (Second District) for whites is $17,467, compared to $7,447 for blacks; more than half of the adult blacks in the Second District have attained only 0 to 8 years of schooling, while the majority of white adults in this District have completed four years of high school; the unemployment rate for blacks is two to three times that for whites; and blacks generally live in inferior housing." *Id.*, at 9a–10a (footnote omitted).

common in Mississippi, and that political processes have not been equally open to blacks.[3]

Because I find no merit in any of the specific challenges presented in the parties' jurisdictional statements,[4] and because the record supports the District Court's findings of fact, as the dissent notes, *post*, at 1011–1012, I join the Court's summary affirmance.

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE joins, dissenting.

The District Court's ruling in these cases presents important questions concerning the construction of the recent amendment to § 2 of the Voting Rights Act of 1965, 96 Stat. 134, 42 U. S. C. § 1973. The District Court in effect has construed the amendment to entitle minority plaintiffs, in a State where there exist present effects from past discrimination, to have a state redistricting plan invalidated if it fails to provide at least one district in which the "minority" is a majority of the eligible voters. This is so even though the challenged redistricting plan is constitutional, is not the product of discriminatory intent, and indeed was intended by the

---

[3] The court also found that there existed "persuasive evidence" that Mississippi's political processes have not recently been open to black persons. In addition, the court particularly noted the following message accompanying a campaign television commercial:

"You know, there's something about Mississippi that outsiders will never, ever understand. The way we feel about our family and God, and the traditions that we have. There is a new Mississippi, a Mississippi of new jobs and new opportunity for all our citizens. [video pan of black factory workers] We welcome the new, but we must never, ever forget what has gone before. [video pan of Confederate monuments] We cannot forget a heritage that has been sacred through our generations." *Id.*, at 12a, n. 8.

The commercial opened and closed with a view of Confederate monuments; the candidate that ran the commercial used "He's one of us" as his campaign slogan. *Ibid.*

[4] Indeed, it should be noted that the District Court's plan would be an acceptable remedy for the violations even if it did not regard the Simpson plan itself as a violation of § 2 of the Voting Rights Act as amended. For after our remand, the District Court could have appropriately decided that the policy of that Act, coupled with the findings of fact concerning the effects of historic discrimination, particularly in the Delta area, required a remedy that established at least one district in which black persons represented an effective majority of the eligible voters.

court which adopted it to "deal fairly with [the State's] black citizens by avoiding any scheme that has the purpose or effect of unnecessarily minimizing or fragmenting black voting strength."

In 1982, the District Court in these cases adopted a redistricting plan for Mississippi's congressional districts in order to remedy district population disparities, revealed by the 1980 census, of up to 17%. In choosing from among several plans offered by the litigants, it sought a plan that would "satisfy the one person, one vote rule and avoid any dilution of minority voting strength." *Jordan* v. *Winter*, 541 F. Supp. 1135, 1142 (ND Miss. 1982) *(Jordan I)*. The court further observed that "[w]hat is required is that the state deal fairly with its black citizens by avoiding any scheme that has the purpose or effect of unnecessarily minimizing or fragmenting black voting strength." *Id.*, at 1143. The court chose the so-called "Simpson" plan because it satisfied most of the State's policy considerations in districting, created two districts with 40% or better black population, and included a district where nearly 54% of the population was black.

On appeal to this Court, the judgment of the District Court was vacated and the case remanded for reconsideration in the light of the 1982 amendments to the Voting Rights Act. *Brooks* v. *Winter*, 461 U. S. 921 (1983). On remand, the District Court found that the very plan which it had approved and adopted in 1982 was unlawful under the amended § 2 of the Voting Rights Act because "the structure of the Second Congressional District in particular unlawfully diluted black voting strength." *Jordan* v. *Winter*, No. GC82–80–WK–0 (ND Miss., Apr. 16, 1984) *(Jordan II)*. I think the rather remarkable conclusion that the 1982 amendments to the Voting Rights Act made unlawful a plan adopted by the District Court, which plan the District Court had adopted with a view to the requirement that "the state deal fairly with its black citizens by avoiding any scheme that has the purpose or effect of unnecessarily minimizing or fragmenting black voting strength," 541 F. Supp., at 1143, should receive plenary review by this Court.

After being presented with the census data revealing the previously mentioned population disparities between existing congressional districts, the Mississippi Legislature in 1981 enacted a new redistricting plan. The Attorney General of the United States refused preclearance, however, and the legislature adjourned without enacting a new plan. A three-judge District Court was convened to hear actions filed by two groups of Mississippi voters

seeking a court-ordered interim plan for the 1982 congressional elections. That court refused to place in effect the legislative plan which had not been precleared, and held the existing districting statute unconstitutional because of the population disparities. It then adopted the "Simpson" plan from among several plans submitted to it by the litigants. *Jordan I, supra.*

In choosing the "Simpson" plan, the court followed the teaching of *Upham* v. *Seamon*, 456 U. S. 37 (1982), which requires courts to fashion interim plans that adhere to a State's political policies. The court identified Mississippi's political districting policies as follows: (1) minimal change from 1972 district lines; (2) least possible population deviation; (3) preservation of the electoral base of incumbent congressmen; and (4) establishment of two districts with 40% or better black population. The court specifically rejected two plans proposed by a group of black plaintiffs. These plans would have kept the predominantly black northwest or "Delta" portion of Mississippi intact, and would have combined that area with predominantly black portions of Hinds County and the city of Jackson. Each of these plans would have resulted in one congressional district with a black population of approximately 65%. The "Simpson" plan, on the other hand, combined 15 Delta or partially Delta counties with six predominantly white eastern rural counties, and resulted in a congressional district with a 53% black population, but a 48% black voting population. The District Court found the "Simpson" plan most nearly in accord with the State's policies articulated above. The rejected plans would have resulted in only one district with greater than 40% black population; this was contrary to the reasonable state policy established to assure that blacks would have an effective voice in choosing representatives in more than one district. In addition, the court noted that the black plaintiffs had managed to place a high percentage of black voters in a single congressional district only through obvious and unseemly racial gerrymanders.

When this Court subsequently vacated the District Court's judgment for reconsideration in the light of the 1982 amendment the District Court held further evidentiary hearings, and concluded that its own plan violated the amended section. This violation occurred, in the opinion of the District Court, because "the structure of the Second Congressional District in particular unlawfully diluted black voting strength." Under the plan adopted by the District Court in 1982, the Second District had a

black population of 53.77%, but blacks comprised only 48.09% of the voting age population. The District Court felt it was obligated, under the 1982 amendments to the Voting Rights Act, to redraw the district map so that the redefined Second District would have a "clear black voting age population majority of 52.83 percent." In doing so, the District Court "recognize[d] that the creation of a Delta District with a majority black voting age population implicates difficult issues concerning the fair allocation of political power." *Jordan II, supra.*

Any statute that would lead a District Court to reject a plan which it had previously found fair to all concerned in favor of one including an obligatory district with a majority black voting age population deserves careful attention, and so I turn to the language of the Voting Rights Act as amended in 1982. The District Court in its most recent opinion set out the statutory provisions toward the beginning of its opinion, but scarcely mentioned that language again, and instead went on to quote extensively from the Senate Report of the 1982 amendments. The applicable statutory language is this:

"(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).

"(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 96 Stat. 134, 42 U. S. C. § 1973 (emphasis in original).

Applying the statutory language to the situation confronting the District Court after our remand, the "voting qualification or prerequisite to voting or standard, practice, or procedure" to which the amended statute is to be applied is obviously the 1982 plan adopted by the District Court. That court clearly thought so, and no other "qualification . . . standard, practice, or procedure" suggests itself. There has never been any suggestion that the plan adopted by the District Court in 1982 denied or abridged the right of any citizen to vote on account of race or color, so if that plan does violate the amended Act it is because it contravenes "the guarantees set forth . . . in subsection (b)."

Subsection (b), in turn, provides that a violation of subsection (a) is established if "it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a)." The District Court read subsection (b) as if it were totally divorced from subsection (a), and proceeded to enumerate factors in the political history of Mississippi which it felt indicated that the plan it had adopted in 1982 "unlawfully dilutes minority voting strength." *Jordan II, supra.* The District Court did not state what it understood the term "unlawfully dilutes minority voting strength" to mean, and since that term is nowhere used in the statutory language one is left to infer that the court derived the necessary meaning for the language from the report of the Senate Judiciary Committee which it cited at some length. The District Court's understanding of what is required by § 2 is highly questionable in light of the statute's language and legislative history. To fully evaluate the District Court's analysis it is necessary to review the events preceding the amendment of § 2.[1]

---

[1] JUSTICE STEVENS' concurrence suggests that my analysis is unwarranted because the problems I perceive with the District Court's opinion were not specifically raised by the "questions presented" in appellants' jurisdictional statements. I believe, however, that several of the "questions presented" "fairly include" the issues that I address. In particular, question 3, quoted *ante*, at 1003 (STEVENS, J., concurring), raises the question of the scope of activity Congress intended to proscribe under § 2. I need not agree 100% with appellants' position—that § 2 only proscribes intentionally discriminatory conduct—to reach the question whether the District Court misconstrued Congress' intent.

In *Mobile* v. *Bolden*, 446 U. S. 55 (1980), this Court wrestled with the question whether legislative "intent" to discriminate must exist in order to find that a particular legislative action violates the Voting Rights Act, or whether it was enough that the legislative action have a "discriminatory effect." In *Mobile* black plaintiffs had brought an action challenging the constitutionality of the city's at-large method of electing its commissioners. We produced six different opinions debating among ourselves whether discriminatory intent was required to find a violation of the Fifteenth Amendment, or whether "an invidious discriminatory purpose could be inferred from the totality of facts." *Id.*, at 95 (WHITE, J., dissenting). None of the opinions challenged the conclusion of the plurality that the Voting Rights Act as it then existed added "nothing to the appellee's Fifteenth Amendment claim." *Id.*, at 61 (opinion of Stewart, J.).

It is clear that the 1982 amendment was precipitated in large part by the holding of *Mobile*. But the language used in the amended statute is, to say the least, rather unclear. The legislative history indicates that Congress was well aware of the "intent effects" dichotomy, and of the problems with identifying actions with discriminatory "effects." The bill originally passed the House under a loose understanding that § 2 would prohibit all discriminatory "effects" of voting practices, and that intent would be "irrelevant." H. R. Rep. No. 97–227, p. 29 (1981). This version met stiff resistance in the Senate, however. Two Senate Subcommittees held extensive hearings, at which testimony was given concerning the tendency of a "results" approach to lead to requirements that minorities have proportional representation, or to devolve into essentially standardless and ad hoc judgments. See, *e. g.*, Hearings on S. 53, S. 1761, S. 1975, S. 1992, and H. R. 3112 before the Subcommittee on the Constitution of the Senate Committee on the Judiciary, 97th Cong., 2d Sess., 1309–1313, 1334–1338 (1982). The Subcommittees could not agree on the proposed amendment, and at that point Senator Dole stepped in with a proposed compromise. The compromise bill retained the "results" language but also incorporated language directly from this Court's opinion in *White* v. *Regester*, 412 U. S. 755 (1973), and strengthened the caveat against proportional representation. The debates on the compromise focused on whether the "results" language would nevertheless provide for proportional representation, or merely for equal "access" to the political process. Senator

Dole took the position that "access" only was required by amended § 2: "[T]he concept of identifiable groups having a right to be elected in proportion to their voting potential was repugnant to the democratic principles on which our society is based." 128 Cong. Rec. 14132 (1982) (remarks of Senator Dole). This position was adopted by many supporters of the compromise in the Senate, and the bill passed as written.

The District Court apparently felt obliged to reach a conclusion in tension with this legislative history because of language in the Senate Judiciary Committee Report on the 1982 amendment stating that the "results" language of § 2(a) was meant to "restore the pre-*Mobile* [v. *Bolden*] legal standard which governed cases challenging election systems or practices as an illegal dilution of the minority vote." S. Rep. No. 97–417, p. 27 (1982). The Report then enumerates the factors courts may consider in deciding whether plaintiffs have established a violation of § 2, factors apparently derived from this Court's opinion in *White* v. *Regester*, *supra*.[2] Applying these "factors," the District Court found that Mississippi has a long history of *de jure* and *de facto* race discrimination, which has present effects in impeding black voter registration and turnout. It noted that although blacks constitute 35% of the State's population, no black has been elected to Congress since the Reconstruction period, and none has been elected

---

[2] Those factors are:

"1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

"2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

"3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

"4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

"5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

"6. whether political campaigns have been characterized by overt or subtle racial appeals;

"7. the extent to which members of the minority group have been elected to public office in the jurisdiction." S. Rep. No. 97–417, at 28–29.

to statewide office in this century. Furthermore, the court found socioeconomic disparities between blacks and whites in the Delta area, and finally, that voters in Mississippi have previously voted and continued to vote on the basis of the race of candidates for elective office. The District Court concluded from this that the adoption of a plan in which the Second District contained less than a majority of voters from a protected class "diluted" the class' voting strength.

Thus we have a statute whose meaning is by no means easy to determine, supplemented by legislative history which led the District Court in this case to conclude that only the inclusion within one congressional district of a majority black voting age population could satisfy the Act. I think it can be fairly argued from the legislative history, and from the express caveat that the section was not intended to establish a right to proportional representation, that in amending § 2 Congress did not intend courts to supersede state voting laws for the sole purpose of improving the chance of minorities to elect members of their own class.

To best understand the meaning of the Senate Committee's references to our decisions in *Mobile* and *White* v. *Regester*, it is essential to remember that those cases dealt with challenges to *multimember legislative districts*. It is only in this context that phrases such as "vote dilution" make any sense, for the phrase itself suggests a norm with respect to which the fact of dilution may be ascertained. In the case of multimember districts, the norm available for at least theoretical purposes is the single-member district. But when we turn from attacks on multi-member districts to attacks on the way lines are drawn in creating five single-member congressional districts, as in the cases at hand, phrases such as "vote dilution" and factors relied upon to determine discriminatory effect are all but useless as analytical tools. Neither *White* v. *Regester*, *Mobile* v. *Bolden*, nor *Zimmer* v. *McKeithen*, 485 F. 2d 1297 (CA5 1973), a case also dealing with challenges to multimember legislative districts, ever suggested that their analysis should be carried over to challenges addressed to single-member districts. And whichever of the views espoused in *Mobile* is found to have been adopted by the 1982 amendment, it would seem that a plan adopted by the District Court under the command "that the state deal fairly with its black citizens by avoiding any scheme that has the purpose or

effect of unnecessarily minimizing or fragmenting black voting strength" should be home free under either test.

Under this view, the District Court's most recent opinion and judgment seem to me to present virtually insuperable difficulties. Although we may regretfully concede that the District Court's findings were correct, it nevertheless seems a non sequitur to say that the past discrimination, and its present effects, have "resulted" in "dilution" of minority voting strength *through the adoption of this particular districting plan.* To the extent that fewer blacks vote due to past discrimination, that in itself diminishes minority voting strength. But this occurs regardless of any particular state voting practice or procedure. As the plurality opinion in *Mobile* recognized in another context, "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Mobile*, 446 U. S., at 74. Here the only finding even remotely related to the boundaries of the Second Congressional District under the 1982 plan is what the District Court referred to as "socioeconomic disparities between blacks and whites in the Delta area." The findings as to the history of racial discrimination and bloc voting apparently obtained throughout the State. It is obvious that no plan adopted by the Mississippi Legislature or the District Court could possibly have mitigated or subtracted one jot or tittle from these findings of past discrimination. What we have, therefore, is in effect a declaration by the District Court that because of these past examples of racial discrimination throughout the State, any plan adopted either by the legislature or by a court which did not give blacks one of five congressional districts in which they had a majority of the voting age population violated the 1982 amendments to the Voting Rights Act. Under this analysis, cause and effect are entirely severed.

For these reasons, I think the judgment of the District Court presents substantial questions concerning the interpretation of a new amendment to the Voting Rights Act of 1965, and that the Court seriously misapprehends its obligation in such a case when it summarily affirms the judgment of the District Court.