Beatrice HOUSTON, et al.,
Plaintiffs–Appellants,

v.

Pat W. HALEY, et al.,
Defendants–Appellees.

No. 87–4469.

United States Court of Appeals,
Fifth Circuit.

Nov. 1, 1988.

Alvin O. Chambliss, Jr., Oxford, Miss., for plaintiffs-appellants.

F. Edwin Perry, Oxford, Miss., for defendants-appellees.

Before BROWN, GEE and GARWOOD, Circuit Judges.

GEE, Circuit Judge:

Beatrice Houston and associated plaintiffs appeal a district court judgment ap-

---

proving an electoral plan instituted by the city of Oxford, Mississippi, under Section 2 of the Voting Rights Act of 1965. Following the 1980 federal census, Oxford introduced a new plan to elect members of its board of aldermen, the governing board of the city. The plan called for election of four aldermen in single-member wards and one at large. Ms. Houston asserts that the at-large feature of this plan violates the Voting Rights Act; she seeks to have the district court, acting under the authority conferred on it by the Voting Rights Act, install five single-member wards. According to Ms. Houston, it is only under this scheme that black voters in Oxford will be able to participate equally in the political process. Our task in today's case is a familiar one: we must evaluate the use of race-conscious remedies to create a more fluid political process without countenancing any move toward installing a structure of proportional representation not in keeping with our theory of government. Having reviewed the findings of the district court under a standard of clear error, we affirm its holding that the "4 and 1" electoral plan is valid under section 2 of the Voting Rights Act of 1965. 663 F.Supp. 346.

### Background

The district court made these findings of fact: In January 1984, based on the data compiled from the 1980 federal census, the city of Oxford acknowledged that its existing four-ward electoral scheme was malapportioned in violation of the one person-one vote principle. (See Table I).

In attempting to redraw the electoral plan to conform to that principle, the city gave notice on several occasions that the board of aldermen would consider proposals submitted by any member of the public. By the March deadline, neither the city planner nor the board of aldermen had received any response whatever from the public. That day, the city planner proposed a four-ward plan with the county courthouse at the center of four quadrants, each of which comprised roughly 25% of the population. (See Table II).

Although approved by the board of aldermen, this plan was never instituted because of objections from Mr. Alvin Chambliss, the attorney for Ms. Houston. First he was given until April 17 and then until May 1 to propose an alternative. Mr. Chambliss, however, did not appear at the May 1st meeting; and no other plan was submitted to the board of aldermen.

Nevertheless, at the board's request yet another plan was crafted, one that was, the parties stipulated, "the best possible plan that could be devised to maximize the black population and black voting strength under a four-ward, one at-large system." (See Table III). In due course, the board of aldermen approved the new plan, and the Justice Department cleared it under section 5 of the Voting Rights Act. As things fell out, however, the plan did not automatically produce the hoped-for black representation on the board of aldermen. Despite the almost 54% black population of Ward 4, no black person qualified to run for alderman in Ward 4 (or any other) in the 1985 city election.

Ms. Houston initiated this lawsuit in July 1984 to challenge the at-large feature of the adopted electoral plan. The parties stipulated that if a five single-member ward plan was adopted one ward could be drawn with a 65% black population; Houston maintains that such a high concentration of the black vote is required to afford blacks an equal opportunity to participate in the electoral process and to elect a candidate of their choice.

### Analysis

Oxford has already adopted a mixed ward/at-large electoral scheme that provides for a ward containing a majority (53.8%) of black citizens. Because this scheme did not produce a black representative and hence, so we are told, denied blacks effective political participation, plaintiffs now urge us to require the aldermen to redesign the system so as to produce a ward with a 65% black population. We can only wonder whether, supposing that the proposed new system still fails to produce a black winner, we will then be

asked to continue down the slippery slope, mandating new designs which segregate blacks into greater and greater concentrations until at last a black is elected? Somewhere along this downward course, the goal of an open and pluralistic political process, where groups bargain among themselves, is transformed into one of proportional representation by persons beholden for office to discrete ethnic groups.

Neither federal nor state laws have so far, we think, sought to alter our nation's choice to conduct politics based on bargaining and political compromise. Candidates for municipal office, at any rate, usually try to put together winning coalitions of voters, black and white, by promising them to support certain policies and to provide various constituent services. A hallmark of our system of government is that a rival candidate need only wait one term to put together a different coalition if the elected representative proves to be unresponsive to any group of constituents. Thus there is the incentive in a majority rule system for elected representatives to patronize all groups, since any neglected may constitute the margin between winning and losing on another day.

There are various structural impediments to such a vision of fluid politics. For example, a representative holding a "safe seat" need not be greatly concerned about the other marginal groups. This is especially true if the safe seat is essentially designed to serve a particular group: a black seat; a white seat; a Mexican–American seat; and so on.[1] Other examples of structural impediments that tend to inhibit this notion of fluid democratic politics are provisions such as a poll tax or residency requirements. Such voting regulations tend to exclude groups from the electoral process, thus preventing them from offering their votes as an incentive for responsiveness by candidates to their concerns. Participation in a democratic system thus centers to great extent on the ability of individuals and groups to bargain and to trade votes—and votes are the currency of politics.

Congress and state legislatures have acted to prohibit some, but only some, of these structural impediments to a fluid political process. Congress, in the Voting Rights Act, prohibited "voting qualification[s] or prerequisite[s] ... imposed by any State abridg[ing] the right of any citizen of the United States to vote on account of race or color." Voting Rights Act of 1965, as amended June 29, 1982, 42 U.S.C. § 1973(a). Examples of such qualifications considered include tests, 42 U.S.C. § 1973b, and poll taxes, 42 U.S.C. § 1973h. Moreover, Congress prohibited, based on the "totality of circumstances," political processes that give a class of citizens "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b).

In evaluating the "totality of the circumstances," Congress noted that "the extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered." *Id.* In the case before us, the extent to which blacks have been elected to office in Oxford is the concern that lies at the core of this litigation. Yet it is important to note that Congress qualified this factor of "electoral success." It *"[p]rovided* that *nothing* in this section [of the Voting Rights Act] establishe[d] a right to have members of a protected class elected in numbers equal to their *proportion* in

---

1. Deliberately to define a political position by the irrelevant criterion of race, and with the avowed intent of producing an office-holder who is black, seems a most dubious undertaking. For one thing, it stands Dr. King's dream—given voice in his August 1963 speech at the Civil Rights March on Washington—on its head:

I have a dream that my ... children will one day live in a nation where they will not be judged by the color of their skin, but by the content of their character.

That was twenty-five years ago, and the children of whom he spoke are adults today. In addition, when such a selection is based on the irrelevant ground of skin color, there is danger that the views which the selectee brings to a position of power may be as eccentric as the gerrymandered shape of the district which was tailored to secure his election.

the population." *Id.* (emphasis added). In this way, Congress sought to preserve a political process which required that various groups, black and white, bargain and cooperate with each other. The representative who emerged from that process would be one for all citizens, not just a particular faction. Political participation thus meant equality of access to play and to win the game; it did not promise equality of result for individual factions.[2]

### Totality of the Circumstances

In *Thornburg v. Gingles,* the Supreme Court identified circumstances that might be probative of § 2 violations and thus of ineffective political participation. 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25, 38 (1986). Referring to the Senate Judiciary Committee's Majority Report accompanying the bill amending the Voting Rights Act, the Court elaborated a variety of factors to be considered in evaluating the political process. It is important to note in applying these factors to the case before us that the Supreme Court acknowledged that

> Although the Senate Report espouses a flexible, fact-intensive test for § 2 violations, it *limits the circumstances* under which § 2 violations may be proved in three ways: *First, electoral devices, such as at-large elections, may not be considered per se violative of § 2.* Plaintiffs must demonstrate that, under the totality of the circumstances, the devices result in *unequal access* to the electoral process. Second, the conjunction of an allegedly dilutive electoral mechanism and the *lack of proportional representation alone does not establish a violation.* Third, the results test does not assume the existence of racial bloc voting; plaintiffs must prove it.

*Id.* at 46, 106 S.Ct. at 2764, 92 L.Ed.2d at 43–44. (emphasis added) (citations omitted). These limiting aspects to the "totality of the circumstances" test are important in assessing Houston's challenge to Oxford's "4 and 1" electoral system generally and its at-large component specifically.

The first factor to which the Senate Report referred was "the extent of any history of official discrimination in the state ... [that affected] the right of the minority group ... to participate in the democratic process." *Id.* at 36–37, 106 S.Ct. at 2759, 92 L.Ed.2d at 38. Noting the findings of historical discrimination detailed in *Jordan v. Winter,* 604 F.Supp. 807, 811–12 (N.D. Miss.1984), (three-judge court), *aff'd summarily,* 469 U.S. 1002, 105 S.Ct. 416, 83 L.Ed.2d 343 (1984), the district court observed that "the effects of historical official discrimination in Mississippi presently impede black voter registration and turnout." In *Jordan,* the district court approved the creation of a congressional voting district with a majority black voting age population to "fully rectif[y] the dilution of black voting strength ... without achieving proportional representation for blacks in Mississippi." *Id.* at 814. As in the case before us, however, the *Jordan* court rejected plans that would have achieved a significantly higher black voting-age population (approximately 60%). Rather, the court decided that "a clear black voting age population majority of 52.83% [was] sufficient to overcome the effects of past discrimination and racial bloc voting and provide a fair and equal contest to all voters...." *Id.* Matters are not so simple in today's case, however, for Ms. Houston—who bore the burden of proof—has provided us with little more than a basis for speculation regarding the *present* black voting age population of Ward 4.

We are offered by her eight-year old figures from the 1980 census, figures which indicate that as of then the black population of all ages in Ward 4 comprised 53.8 percent of the total.[3] In addition, there is only the testimony of a professional demographer, reading, in pertinent part:

> [Y]ou are talking about a district that is 53 percent total population. I've not did

---

2. As we know, Madison warned endlessly of the dangers of factions controlling the democratic process. *See The Federalist* No. 10 (J. Madison).

3. Strictly speaking, it was slightly smaller, there being present a small number of other nonwhites lumped into this figure.

[sic] an analysis on voting age population, but based on my experience across the state of Mississippi in more than 50 cases like this, there is a 5 to 9 percent difference in the voting age population than the total population. And so we're talking about at the most a 48 percent black voting age population district.

The demographer's testimony was chiefly concerned with other factors affecting black voting strength, factors such as income and education levels; and the above —his sole reference to black voting numbers—is little more than an aside. As such, we find it ineluctably ambiguous: does his statement mean that if the all-ages population of an area in Mississippi is 53 percent black and 47 percent white, then the black percentage must be decreased by 5–9 percent and the white increased correspondingly to arrive at the voting age percentages? or does he mean that the percentage of underage blacks in Mississippi varies from 5 to 9 percent of the general black population, so that the raw population figure of 53 percent must be scaled back to 44 to 48 percent of the total population for a voting age figure, with the raw figures for whites being similarly scaled back for underage citizens by some percentage that he does not state? If the former, he has testified that in 1980 the probable voting age percentages in Ward 4 were at best 48 percent black and 52 percent white, and at worst 44 percent black to 56 white. If the latter, his testimony is that in 1980 there was in Ward 4 a 44–48 percent black voting population, a 5–9 percent black underage group, and a general white population of 46 or 47 percent, some unspecified percentage of which were underage. In this latter event, it is quite possible that there was a black voting age majority in Ward 4 eight years ago.[4] We simply cannot tell from these cryptic remarks. But even on the first reading of

them, that eight years ago there was (at worst) a 44 percent black/56 percent white voting age distribution in Ward 4, we cannot find the trial court's approval of the plan clearly erroneous. Whatever the voting age population composition was then, given mobility, mortality, and coming of age, we cannot tell with any certainty what it is today—certainly not with such a degree as to conclude, given the trial court's findings on the other *Thornburg* factors which we shall presently discuss, that its approval of the election plan was clearly erroneous.

The second factor reported by the Supreme Court is "the extent to which voting in elections of the state or political subdivision is racially polarized." *Thornburg,* 478 U.S. at 37, 106 S.Ct. at 2759, 92 L.Ed.2d at 38. The presence of racially polarized voting must be proved by the plaintiffs. *Id.* 478 U.S. at 46–47, 106 S.Ct. at 2764, 92 L.Ed.2d at 44. Two inquiries are particularly relevant. First, a court must ascertain whether minority group members constitute a politically cohesive unit. *Id.* at 56, 106 S.Ct. at 2769, 92 L.Ed.2d at 50. The plaintiffs must show that "a significant number of minority group members usually vote for the same candidate." *Id.* Second, the court must "determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates." *Id.* Overall, "a white bloc vote that normally will defeat the combined strength of minority support plus white 'cross-over' votes rises to the level of legally significant white bloc voting." *Id.* In general, the Supreme Court has noted that "there is no simple doctrinal test for the existence of legally significant racial bloc voting." *Id.* at 58, 106 S.Ct. at 2770, 92 L.Ed.2d at 51. Usually one looks to a "pattern of racial bloc voting that extends over a period of time[.] [Such a pattern] is more probative

---

**4.** On this second reading of his testimony, taking the 1980 total population figure for Ward 4 of 2451, and the demographer's worst-case figure of 9 percent, it is possible to extrapolate a minimum black voting age population then in the ward of 44.8 × 2451, or 1098. Parallel calculations indicate, as of that long-past time, a Ward 4 black population below voting age of

220 and a total white population there (all ages) of 1133. There is, however, no basis for calculating the white voting-age population. Obviously, however, if the white under-age population percentage is even so much as half of the 9 percent maximum postulated for the ward's black population, the white voting age population calculates as 1133 − (1133 × 4.5), or 1082.

of a claim that a district experiences legally significant polarization than are the results of a single election." *Id.* (footnote omitted).

The present case lacks evidence of racially polarized voting. Although the district court found that only one black individual has run for alderman in Oxford and that no black has been elected to the office, no evidence indicates that either result was produced by racial polarization. In 1973, Mr. Hodges, a black individual, ran for alderman and was narrowly defeated.[5] The district court found that the election had limited relevance in that it was not conducted under the "4 and 1" scheme at issue here. It is useful to note, however, that Hodges attracted cross-over support from white voters, a circumstance which plainly calls into question the existence of white bloc voting. In 1977, Mr. Hodges ran and was again defeated. Even though this election was similar to the current controversy in that it utilized a "4 and 1" scheme, no evidence was introduced to show that Mr. Hodges lost because of racial bloc voting. Certainly the mere fact that he lost does not constitute such evidence. In 1981, no black individual qualified for the municipal election under the same "4 and 1" scheme. Finally, in 1985, despite a 53.8% black district created by the 1984 electoral plan, no black person qualified to run for the board of aldermen. This failure despite the presence of a potential majority calls into question whether the minority group members constitute a politically cohesive unit or, supposing that they do, are dissatisfied with representation by a white individual.

Nor does the "historical pattern" of voting in Oxford indicate racially polarized voting in the "4 and 1" plan at issue today. Although it is acknowledged that until more recent decades blacks have suffered discrimination in Mississippi denying them effective political participation, this fact does not establish the present existence of racial bloc voting—a circumstance that cannot be assumed under the analysis of

*Thornburg.* *See id.* at 46–47, 106 S.Ct. at 2764, 92 L.Ed.2d at 44. In municipal elections since 1973 the record proves little either way: a vote under a dissimilar electoral scheme; cross-over votes by whites; and lack of political cohesion by blacks despite the creation of a district with a black majority.

The third and fourth factors to which the Supreme Court directs us concern election procedures. In considering the "totality of the circumstances," we must consider "the extent to which the state ... has used unusually large election districts, majority vote requirements ... or other voting practices ... for discrimination against the minority group." *Thornburg,* at 37, 106 S.Ct. at 2759, 92 L.Ed.2d at 38. Moreover, within any election scheme "if there is a candidate slating process, whether the members of the minority group have been denied access to that process." *Id.*

The district court pointed out that the parties stipulated that the existing "4 and 1" electoral scheme maximizes black voting strength and connects the two largest black areas available for combination without violating the one person-one vote principle. The district court also noted that "the ward lines do not separate cohesive neighborhoods, and the districts are not [so] unusually large," as to hamper the ability of blacks to campaign.

We concur in the district court's overall assessment that there was no evidence presented to the court indicating that polarized voting prevented minority candidates from effectively seeking white votes. Nor do we find any evidence that a candidate slating process existed in Oxford that produced a discriminatory impact on the one black candidate who has sought office.

The fifth factor to be considered is "the extent to which members of the minority group ... bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political pro-

---

5. He attained the runoff election, which he lost by 34 votes. His total vote count was 1,215; and only about fifty blacks voted in the election.

Thus it is apparent that Hodges attracted substantial white support.

cess." *Thornburg*, at 37, 106 S.Ct. at 2760, 92 L.Ed.2d at 38. Evidence relevant to this factor tends also to bear on another consideration mentioned by the Supreme Court: "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." *Id.*

The district court found that local government responded to the needs of the black population, which made up 21.2% of the general population of Oxford. The fire and police departments are at least 20% black and have been for the last eight years. In 1985, blacks composed 26.5% of the city work force and by 1986 the percentage had grown to 27.1%.

As for municipal management decisions, the district court found that blacks serve on all city boards, with the sole exception of the hospital board. In addition, of the three appointed positions on the five-member school board, one is black and two are white. The Oxford Election Commission consists of one black and two whites. Thus, whether or not blacks have been able—or have wished—to elect a black alderman, the evidence indicates that blacks have a voice in management decisions and that government is responsive to their concerns: the essence of effective political participation.

Moreover, with respect to facilities, the local hospital and health system are available to everyone regardless of race. The city has provided a swimming pool, a gym, baseball fields, tennis courts, and recreation center in the area of town that is predominantly black, employing federal grants to upgrade existing facilities and to provide new housing there.

The sixth factor that the Supreme Court analyzed was "whether political campaigns have been characterized by overt or subtle racial appeals." *Thornburg*, at 37, 106 S.Ct. at 2760, 92 L.Ed.2d at 38. The district court found no evidence indicating that Oxford has experienced campaigns characterized by racial appeals. In fact, the election of Patricia Lamar, a white, offers a vignette of political practice in Oxford and underscores the bargaining and

coalition-building conception of democratic politics. As the district court points out, Patricia Lamar is in her second term as an alderman for Ward 3 in Oxford. Ms. Lamar campaigns door-to-door in both black and white neighborhoods. She both receives telephone calls from black constituents, and regularly discusses problems with them.

The seventh factor elaborated is the "extent to which members of the minority group have been elected to public office in the jurisdiction." *Thornburg*, at 37, 106 S.Ct. at 2760, 92 L.Ed.2d at 38. Because only one black has run, the sample size is too small for any conclusions about electability. It is also useful to recall that while Congress prohibited, based on the "totality of the circumstances," political processes that denied citizens the *opportunity* to elect representatives of their choice, that prohibition did not guarantee proportional representation.

### Conclusion

Analysis of voting rights problems thus is framed by the "totality of the circumstances" standard elaborated in *Thornburg*. The seven factors discussed are based on an historical evaluation of "whether the political process is equally open to minority voters." *Thornburg*, at 79, 106 S.Ct. at 2781, 92 L.Ed.2d at 65. "This determination is peculiarly dependent upon the facts of each case ... and requires 'an intensely local appraisal of the design and impact' of the contested electoral mechanisms." *Id.* Because the analysis is so profoundly fact-specific, a "clearly-erroneous" standard of appellate review is appropriate. This standard of appellate review "preserves the benefit of the trial court's particular familiarity with the indigenous political reality without endangering the rule of law." *Id.*

Examining the factual background and analysis set forth by the district court and applying a clearly-erroneous standard of review, we conclude that the district court correctly evaluated the "totality of the circumstances: Under the current "4 and 1" electoral scheme, the political processes for

electing aldermen in Oxford, Mississippi, afford blacks an equal opportunity to elect a representative of their own choosing.

The city gave the plaintiffs many opportunities to develop a proposal that would satisfy their concerns about effective participation. When they failed to come forward, the city devised two plans, the second of which was adopted. This plan maximized black voting strength to the greatest extent possible under the "4 and 1" plan; indeed, it created one ward with a 53.8% black population, increasing the possibilities for blacks to elect the representative of their choice.

Scrutinizing this electoral scheme under the guidance of *Thornburg*, we conclude that the "totality of the circumstances" in Oxford are in keeping with fluid political process. First, the creation of a majority black population seems sufficient, in view of the favorable condition of the other *Thornburg* factors, to overcome the effects of past discrimination which once stigmatized Mississippi politics as well as current violations of Section 2 of the Voting Rights Act. Second, in the case before us, there is no evidence of racially polarized voting as there was in *Jordan*. Only one black has run for office, and he attracted cross-over votes in the course of being narrowly defeated. This fact, however, has limited relevance in that it took place in an election under a different scheme. More important was the fact that no black candidate qualified to run for the board of aldermen in 1984 despite the black majority in one district. Third, there were no tactics such as an unusually large voting district that operated to discriminate against minority candidates. Fourth, there was no candidate slating process that denied black candidates access to the political process. Fifth, those elected proved responsive to the concerns of blacks. Moreover, blacks participate in the management decisions of the city through administrative positions. Sixth, there is no evidence that political campaigns have been characterized by overt or subtle racial appeals. Finally, although it

must be conceded that no black has been elected alderman, the process remains open for blacks to run, to build coalitions and to satisfy black concerns and demands for constituent services.

The *Thornburg* factors require a case-by-case analysis in order to preserve "the benefit of the trial court's particular familiarity with the indigenous political reality...." *Thornburg*, at 79, 106 S.Ct. at 2782, 92 L.Ed.2d at 65. When we ask how far is far enough for courts to intervene in the political process,[6] we must ask whether any group is systematically prevented from competing and coalescing with other groups to produce a realistic possibility for electoral victory. If groups are not systematically impeded in competing, courts must not interfere in the game of politics. As is illustrated above, the election of Patricia Lamar in ward 3 points toward this competitive and fluid notion of politics. In that district, representation is given meaning not by the color of Ms. Lamar's skin but by the fact that she puts together coalitions of voters, black and white, and is responsive to their concerns.

After reviewing the findings of the district court and considering the teaching of *Thornburg*, we AFFIRM the findings of the district court that the "4 and 1" electoral plan of Oxford for electing aldermen was valid under Section 2 of the Voting Rights Act of 1965.

TABLE I
Composition of Electoral Scheme
in Oxford before 1984.

| Ward | No. of Persons | % of Total Population |
|------|------|------|
| 1 | 2,319 | 23.5 |
| 2 | 2,544 | 26.7 |
| 3 | 1,954 | 19.8 |
| 4 | 2,965 | 30.0 |

TABLE 2
Plan # 1—Quadrant Scheme

| Ward | Population | | |
|------|------|------|------|
| 1 | 2,557 | 25% = | 2,470.5 |
| 2 | 2,406 | | |
| 3 | 2,540 | | |
| 4 | 2,379 | | |
| | 9,882 | | |

6. *See* Schuck. *The Thickest Thicket: Partisan Gerrymandering and Judicial Regulation of Politics,* 87 *Colum.L.Rev.* 1325 (1987) (consequences and side-effects of judicial interference with political behavior).

TABLE 3
Plan # 2—Black Concentration Scheme

| Ward | Population | % Black |
|------|-----------|---------|
| 1 | 2,533 | 6.1 |
| 2 | 2,358 | 14.5 |
| 3 | 2,540 | 17.0 |
| 4 | 2,451 | 53.8 |

TABLE 4

| | Ward 4 |
|---|---|
| Total Population | 2,451 |
| Percent of City | 24.8% |
| | |
| Total White Pop. | 1,133 |
| Percent of Ward | 46.2% |
| | |
| Total Black & Other Pop. | 1,318 |
| Percent of Ward | 53.8% |

JOHN R. BROWN, Circuit Judge, dissenting.

I cannot join in the court's opinion in this case. The gains for black political participation for which members of this court and many others persevered in the past two decades have been significant and substantial. It cannot truly be said, however, that equal access to the political process has yet been achieved by blacks—and once achieved, someday, that equal access is unlikely ever to be "assured." The advances made thus far remain fragile, and in need of jealous guardians. We must reach out affirmatively to protect the advances made thus far and to nurture those that remain to be made.

*What's in a Number*

As the majority acknowledges, the *Jordan* court rejected alternative electoral plans "that would have achieved a significantly higher black *voting-age* population of (approximately 60%) [,] ... decid[ing] that 'a clear black *voting age* population majority of 52.83% [was] sufficient to overcome the effects of past discrimination'" (emphasis added). Having analyzed *Jordan* in terms of figures for black population *of voting age*, however, the majority engages in what appears to be a sophisticated Socratic dialogue on the deduction/addition of the 5–9% non-voting age from/to the 53%/47% black/white population resulting, in one instance, in a supposition that in 1980 there was a majority of black voters of voting age. Solving the

riddle the majority concludes that the 53.90% black population *of all ages* created in Ward 4 by the 4–and–1 plan somehow "satisfies" the threshold suggested in *Jordan*. In the worn out, war weary figurative, such a conclusion erroneously compares apples and oranges. I insist—and continue to insist—that we must compare either (i) the *Jordan* figure for black population of voting age to the Ward 4 figure for black population of voting age, or (ii) the *Jordan* figure for black population of all ages to the Ward 4 figure for black population of all ages. We cannot sensibly compare a figure for black population of voting age in one case to a figure for black population of all ages in another case.

The black population *of all ages* in the black majority district created in *Jordan* was 58.30%.[1] The black population *of all ages* in the black majority district at issue in the instant case is only 53.90%.

The black population *of voting age* in the black majority district created in *Jordan* was 52.83%.[2] The black population *of voting age* in the black majority district at issue in the instant case was not directly in evidence. Therefore, if *Jordan* is to establish a threshold to be applied in this case, logically that threshold must be the 58.30% figure for the black population *of all ages* in the black majority district created in *Jordan*, and not the 52.83% figure for the black population *of voting age* in the black majority district created in *Jordan* which the majority opinion employs in this case.[3]

Though there was no direct evidence as to the black population *of voting age* in the black majority district at issue in the instant case, that is not to say that there was no effort made at trial to address black population *of voting age*. The black population *of voting age* was indeed demonstrated, although indirectly. Expert testimony was received on this point from Mr. Louis Armstrong, a professional demogra-

1. *See* 604 F.Supp. at 814 or 819.

2. *Id.*

3. The 58.30% figure from *Jordan* is the one that the District Court in this case used. *See* 663 F.Supp. at 348 n. 3.

pher:[4]

[Y]ou are talking about a district [Ward 4] that is 53 percent total population [i.e., in which nonwhites comprise 53.8% of the total population of the district]. I've not done an analysis on voting age population, but based on my experience across the state of Mississippi in more than 50 cases like this, there is a 5 to 9 percent difference between the [black] voting age population and the total [black] population.[5] And so we're talking about at the most a 48 percent black voting age population district [i.e. a district in which the proportion of blacks of voting age to the total population of all ages in the district is approximately 0.48]. Then when you add the other socioeconomic characteristics, low income level, the low education level, the low employment level, then you begin to find that blacks participate less in government proportionally than whites based on these socioeconomic characteristics.

This expert's testimony, presented in tabular form, indicates:

FOR WARD 4 ONLY:

5% DIFFERENCE:

| | |
|---|---|
| White Population of All Ages | 1133 |
| Black Population | |
|     Voting Age | 1196 |
|     Non–Voting Age | 122 |
| Total Population (all ages) | 2451 |

9% DIFFERENCE:

| | |
|---|---|
| White Population of All Ages | 1133 |
| Black Population | |
|     Voting Age | 1098 |
|     Non–Voting Age | 220 |
| Total Population (all ages) | 2451 |

On this basis, the majority could conclude that it is possible to extrapolate a minimum black voting age population in Ward 4 of .448 × 2451, or 1098. It then speculates that the white voting age population of Ward 4 is 1133—(1133 ×.045), or 1082 (see n. 4). It makes this estimation even though it acknowledges that Mr. Armstrong's testimony provides "us with little more than a basis for speculation regarding the *present* black voting age population of Ward 4." The "need" for making that estimation stems from the majority's summary dismissal of the 1980 census data for the city of Oxford as a whole which was submitted at trial:

| | C1 | C3 |
|---|---|---|
| | Total Pop. (all ages) | Total Pop. of Voting Age |
| White | 7635 | 6320 |
| Black | 2098 | 1260 |
| Other | 149 | 123 |
| Total | 9882 | 7703 |

**4.** Armstrong further elaborated on his qualifications. He holds a B.S. degree from Jackson State University and has also taken graduate courses in public administration at that same institution. He is a member of the Public Administration Society of America and is also certified by the District Courts for the Northern and Southern Districts of Mississippi as an expert witness to provide and interpret census and other demographic data for Mississippi.

**5.** Standing alone, that statement is ambiguous. It could have either of two meanings:

(i) $\dfrac{\text{BPAA} - .09}{\text{TP}} < \dfrac{\text{BPVA}}{\text{TP}} < \dfrac{\text{BPAA} - .05}{\text{TP}}$

(ii) (BPAA)(.05) < BPVA < (BPAA)(.09)

where BPAA = Black Population of All Ages
BPVA = Black Population of Voting Age
TP = Total Population (all ages)

The remainder of the expert's testimony quoted in the text indicates that the first meaning is that which he meant to signify. The statement is potentially misleading, in that $\dfrac{\text{BPVA}}{\text{TP}}$, not $\dfrac{\text{BPVA}}{\text{TP}}$, is the measure of black voting strength (where TPVA = Total Population of Voting Age).

From this census data, we may compute the following table:

TABLE 1

| C1 | C2= C1/9882 | C3 | C4= C3/7703 | C5=(C2−C4)/ [C2+C4)/2] | C6= C3/C1 |
|---|---|---|---|---|---|
| Total Pop. (all Ages) | % of Pop. | Total Pop. of Voting Age | % of Pop. of Voting Age | % error when C2 used as estimate of C4 | % of Group which is of Voting Age |
| White 7635 | 77.26% | 6320 | 82.04% | − 6.00% | 83% |
| Black 2098 | 21.23% | 1260 | 16.36% | +25.91% | 60% |
| Other 149 | 1.51% | 123 | 1.60% | − 5.79% | 83% |
| Total 9882 | 100.00% | 7703 | 100.00% | 0 | 78% |

Citywide in Oxford, blacks comprise a lower proportion of the total population *of voting age* (16.36%) than they do of the total population *of all ages* (21.23%). Put differently, the proportion of the total population *of all ages* which blacks comprise in Oxford *overestimates* the proportion of the total population *of voting age* which blacks comprise in Oxford. Concomitantly, the proportion of the total population *of all ages* which whites comprise in Oxford (77.26%) *underestimates* the proportion of the total population *of voting age* which whites comprise in Oxford (82.04%).

On the modest and plausible assumption that the percentage of each racial group which is of voting age (C6 of Table 1) does not vary appreciably from place to place *within* the city of Oxford, then it is also true that (i) the proportion of the total population *of all ages* which blacks comprise in any given electoral district in Oxford *overestimates* the proportion of the total population *of voting age* which blacks comprise in that same given electoral district in Oxford, and (ii) the proportion of the total population *of all ages* which whites comprise in any given electoral district in Oxford *underestimates* the proportion of the total population *of voting age* which whites comprise in that same given electoral district in Oxford. If blacks in Oxford comprise x% and whites comprise (100−x)% of the total population of a district, then blacks would comprise *less than* x% of the voting age population of that district and whites would comprise *more than* (100−x)% of the voting age population of the district. This proposition becomes more readily apparent when a portion of the same data—for Ward 4 of the City of Oxford—is presented below in a format similar to that which the *Jordan* trial court used in the table which appears in its opinion: [6]

TABLE 2A

| C1 | C2 | C3= C2/C1 | C4= C5+83% of (C1−C2) | C5= 60% of C2 | C6= C5/C4 |
|---|---|---|---|---|---|
| Total Pop. (all ages) | Black Pop. of All Ages | % Black | Total Pop. of Voting Age | Black Pop. of Voting Age | % of Black Pop. of Voting Age |
| 2451 | 1318 | 53.77% | 1731 | 791 | 45.70% |

Compare:

TABLE 2B

| C1 | C2 | C3= C2/C1 | C4= C5+60% of (C1−C2) | C5= 83% of C2 | C6= C5/C4 |
|---|---|---|---|---|---|
| | | | Total Pop. of Voting Age | White Pop. of Voting Age | % of White Pop. of Voting Age |
| Total Pop. 2451 | White Pop. 1133 | % White 46.23% | 1731 | 940 | 54.30% |

6. *See* 604 F.Supp. at 814 or 819. The headings used here are slightly different than those in the *Jordan* table. Columns Cl through C6 of my Tables 2A and 2B correspond to columns 2, 4, 5, 6, 7 and 8 of the *Jordan* table.

The so-called black majority ward, Ward 4, turns out on the basis of *this* data not to be a black majority ward at all.

As the majority points out, in language which closely resembles that with which I criticized a now-defunct footnote to the original proposed majority opinion: the cumulative effect of individual births, deaths, attainments of majority, and migrations in and out of Oxford since 1980 cannot reliably be ascertained at present. The majority urges on that basis that 1980 census data is too "out-of-date" for us to draw the conclusion that Oxford's 4–and–1 scheme cannot stand.

The majority also states, however, that "[a] hallmark of our system of government is that a rival candidate need only wait one term to put together a different coalition [of voters] if the elected representative proves to be unresponsive to any group of constituents." But the democratic guarantee into which the majority implicitly admonishes Houston and others to put their faith has little value if they must wait up to ten years for "fresh" census data with which to seek a redress of the failure of that guarantee.

No doubt the underlying reality which the 1980 census data in the record measured has been altered in some way by the course of human events in Oxford these eight years past. Just what that alteration has been will not be known until the 1990 census results become available. Of course, even that data will not be exact. The knowledge that our data is to some unknown extent out-of-date is not particularly troubling, however. In any measurement system—no matter how sophisticated or finely-tuned—there is always some degree of inherent inaccuracy. When such a

measurement system is applied to a dynamic [situation 2], additional inaccuracy is introduced: the data is to some extent "out-of-date" from the instant the measurement is completed and reported. But the knowledge that a yardstick is not precisely one yard long and that a child grows with every passing moment does not preclude using that yardstick to record his growth by marks upon the frame of the kitchen door from time to time. The results of such a measurement are reported to faraway relatives perhaps some weeks or months after the measurement is made, and are held forth as—and accepted as—being reasonably accurate, even though all concerned know the child surely has grown another inch or two in the interim. This knowledge does not make a new measurement mandatory (save, perhaps, in the reckoning of our hypothetical little boy or girl). A new measurement can be and *is* made *only* so often as is practical and useful. Consistent with this principle, indulgent parents might even consent to measure their child's growth weekly or even daily, but the same principle constrains the national census to make its measurements decennially.[7] Fortunately, however, the national census need not instantaneously take account of each growing child's attainment of majority in order to serve as a reliable guide for judicial decision. Just as inaccuracies in the measuring system do not deter us from recording a child's growth in the fashion described, they need not and should not preclude our reasonable reliance on 1980 census data in 1988.

Within the acceptable limitations of the best available data, it is apparent that in Ward 4 under the 4–and–1 plan, *black voters remain outnumbered.*

7. If it were true that one set of census data was intolerably inaccurate before the next census, then it seems likely that our decennial census would instead take place more frequently—perhaps every five years, for instance. Indeed, some census measurements *do* take place more frequently than decennially, now that census data is used for many purposes, public and private, that go far beyond the allocation of seats in the House of Representatives. That allocation continues to be made decennially,

however. The 1980 census data will continue to form the basis of that allocation until the 1990 census data becomes available, in 1992 or so. This is so despite the fact—which is common knowledge—that population shifts since 1980 have increased the population of the South and West relative to the Northeast. If decennially-gathered data is nevertheless sufficiently accurate for allocating House seats, it surely should be sufficiently accurate for our present purposes in this case.

As set forth above, in reaching this conclusion I have assumed that the percentage of each racial group which is of voting age (C6 of Table 1) does not vary appreciably from place to place within the city of Oxford. This assumption is no greater or riskier than the expert's assumption—implicitly accepted by the majority—that the difference between the black voting age population and the total black population in Oxford is the same as the statewide average difference. And certainly it is far more conservative than the assumption that the percentage of the total population of the ward which is black is an adequate and reliable estimate of the percentage of the voting population of the ward which is black.

It bears reiterating that there is no magic in either my figures or those employed by the majority. *Jordan* mandates no specific percentage of black voting age population in a district, but rather mandates a percentage "sufficient to overcome the effects of past discrimination." 603 F.Supp. at 814. The determination of what percentage is sufficient is to be made on a case-by-case basis. The divergence between my calculations and those of the majority serves primarily to reaffirm the need for caution before concluding on the basis of one set of figures that all is well—no more and no less. But that reaffirmation is loud, clear, unmistakable, and commanding.

### Stopping the Buck

In deciding whether relief is warranted, federal courts are not confined to the "seven factors" enumerated in *Thornburg*. Section 2 clearly states that "totality of the circumstances" is the test. Given, however, that "Mississippi has a long history of *de jure* and *de facto* race discrimination,

that racial bloc voting is common in Mississippi, and that political processes have not been equally open to blacks," [8] we should look quite literally and *expansively* to the *totality* of the circumstances.

In addition to the seven enumerated factors which guide the majority's analysis, the majority considers an eighth factor: "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." [9] This factor appears in the Senate Report on the 1982 amendments as one of two "[a]dditional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a [§ 2] violation." [10] The majority bypasses without comment the other member of that pair, namely "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous."

This court has previously characterized this factor as "of ... diminished importance ... under the results test" and expressed "doubt that the tenuousness factor has any probative value for evaluating the 'fairness' of the electoral system's impact." *Jones v. City of Lubbock,* 727 F.2d 364, 383 (5th Cir.1984). This factor does retain some of its vitality even under the results test, however. S.Rep. No. 417 at 29 & n. 117, 1982 U.S.Code Cong. & Ad.News at 207 & n. 117. The District Court certainly considered this factor—apparently on an equal basis with the seven enumerated factors and the responsiveness factor. It began by acknowledging that

> [t]he strength of a given political jurisdiction's policy in favor of a particular electoral scheme is admittedly a more rele-

**8.** *Mississippi Republican Executive Committee v. Brooks,* 469 U.S. 1002, 1004–05, 105 S.Ct. 416, 417, 83 L.Ed.2d 343, 344 (1984).

**9.** S.Rep. No. 97–417, 97th Cong., 2d Sess. 29 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad. News 177, 207.

**10.** *Id.* I observe, however, that the "Senate Report expressly states that 'the election of a few minority candidates does not "necessarily foreclose the possibility of dilution of the black

vote,"' noting that if it did '*the possibility exists that the majority citizens might evade [§ 2] by manipulating the election of a "safe" minority candidate.'*" 478 U.S. 30, 75, 106 S.Ct. 2752, 2779, 92 L.Ed.2d 25, 62 (emphasis added). The possibility of evasion of § 2 through just enough grudging "responsiveness" by white incumbents also exists. Therefore, this "responsiveness" factor should be discounted appropriately. Section 2 guarantees blacks more than just crumbs from the whites' political table.

vant consideration under the intent standard than under the results standard of section 2. *See [United States v.] Marengo County [Commission],* 731 F.2d [1546,] 1571 [*cert. denied,* 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984)]. *However, the strength of the underlying policy is still relevant* because a finding of discriminatory intent may provide circumstantial evidence that the particular electoral device produces discriminatory results. Furthermore, *a tenuous justification for a policy may also indicate that the policy itself is unfair.*

663 F.Supp. at 355–56 (emphasis added). The District Court then went on to conclude that "the policy of electing aldermen by wards is not tenuous [because it] is mandated by state statute"—namely, Miss. Code Ann. § 3374–36 (1942). 663 F.Supp. at 356. But the court need not—nor should it—restrict itself to looking to the policies underlying the decision of the responsible *city* authorities to implement a 4–and–1 system, but instead may also look to the policies underlying the decision of the Mississippi legislature to *mandate* that the city authorities decide in certain specified circumstances to implement a 4–and–1 system. While the city authorities may have had a justification for their actions that certainly could not be described as "tenuous," this does not resolve the question whether the legislature had an adequate justification for *its* action. We must foreclose the possibility that local and state authorities could evade the review of the justification for an at-large system that the "tenuousness" factor requires—even under the results test—simply by shifting ultimate responsibility for the existence of such a system from the local to the state level.

The conflicting sets of statistics here leave room for reasonable observers to disagree as to which set accurately portrays reality in present-day Oxford. Given the history of the area at issue here, however, the court should be conservative on the side of making certain that black access to political participation is protected and nurtured. This does not mean that an entitlement to a black election winner exists or

that we need find ourselves sliding uncontrollably down the slippery slope which the majority forbodes. It means simply that where, as here, (i) there are no equities that favor the present system over the proposed alternative (ii) the present system much less-reliably overcomes the effects of past discrimination than the proposed alternative, and (iii) the administrative burden of implementing the proposed alternative is minimal, then there is no reason for judicial reluctance to mandate—in furtherance of Congressional intent—that the present electoral system be supplanted with that superior alternative.

I must, therefore, respectfully dissent.