157 F.Supp.2d 1145 (2001)
The UNITED STATES of America, Plaintiff,
v.
BLAINE COUNTY, Montana; Don K. Swenson, Arthur Kleinjan and Victor J. Miller, in their official capacities as members of the Blaine County Board of Commissioners; and Sandra Boardman, in her official capacity as Clerk and Recorder and Superintendent of Elections for Blaine County, Montana, Defendants.
No. CV99-122GFPMP.
United States District Court, D. Montana, Great Falls Division.
July 23, 2001.
*1146 *1147 Christopher Coates, Joseph D. Rich, Sabrina Whitehead Jenkins, Avner Shapiro, Civil Rights Division, U.S. Department of Justice, Washington, D.C., Bill Mercer, Assistant U.S. Attorney, Missoula, for Plaintiff.
J. Scott Detamore, William Perry Pendley, Mountain States Legal Foundation, Denver, CO, Rebecca W. Watson, Gough, Shanahan, Johnson & Waterman, Helena, MT, for Defendants.

ORDER
PRO, District Judge.

I. INTRODUCTION
Before the Court for consideration is a Motion for Summary Judgment (Docs. # 23, # 24, and # 25) filed by Defendants Blaine County, Montana, Don K. Swenson, Arthur Kleinjan, Victor Miller and Sandra Boardman (collectively referred to as "Blaine County") on January 31, 2001. Plaintiff United States of America ("United States") filed a Response to Defendants' Motion for Summary Judgment (Docs. # 30 and # 31) on February 28, 2001. Blaine County filed a Reply (Doc. # 35) on March 14, 2001.
On May 17, 2001, this case was reassigned from the United States District Court for the District of Montana, Great Falls Division to the United States District Court for the District of Nevada by order of Chief Judge Donald W. Molloy (Doc. # 47).
On July 6, 2001, this Court heard oral argument regarding Blaine County's Motion for Summary Judgment.

II. FACTUAL BACKGROUND
Blaine County, Montana is governed by a three member Board of Commissioners elected at large by all of the voters in the County. Candidates must reside in one of three districts, but the entire County elects each Commissioner. Commissioners are elected to six year terms, and the terms are staggered such that one County Commissioner position is open for election every two years.
According to the 1990 census, Blaine County has a total population of 6,728. The County is predominantly comprised of two ethnic groups, with 59.8% of Blaine County residents being Caucasian, and 39.2% of residents being Native American.[1]
The United States contends that the current system of at-large apportionment has resulted in discrimination against Native Americans. To support this claim, they note that no Native American has served as a County Commissioner in the eighty-six year history of Blaine County. The United States asserts that if the present voting scheme was converted to single member districts, the Native American population is sufficiently numerous and geographically compact so that Native Americans would likely constitute a voting majority in one of the single member districts.
In its complaint, the United States alleges that Blaine County's current voting system violates § 2 of the Voting Rights Act, 42 U.S.C. § 1973 (1994), in that Native Americans have less opportunity than their Caucasian counterparts to elect representatives *1148 of their choice. Blaine County has filed the instant Motion for Summary Judgment alleging that the 1982 amendments to § 2 of the Voting Rights Act are unconstitutional on their face and unconstitutionally applied in this case.

III. LEGAL STANDARD FOR MOTION FOR SUMMARY JUDGMENT
A motion for summary judgment is a procedure which terminates, without a trial, actions in which "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A summary judgment motion may be made in reliance on the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." Id.
The United States Supreme Court delineated Rule 56 in a trilogy of opinions rendered in 1986. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). According to the Court, the movant is entitled to summary judgment if the non-moving party, who bears the burden of persuasion, fails to designate "'specific facts showing that there is a genuine issue for trial.'" Celotex Corp., 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)). In order to preclude a grant of summary judgment, the non-moving party must do more than show that there is some "metaphysical doubt" as to the material facts. Matsushita Elec. Indus. Co., 475 U.S. at 586, 106 S.Ct. 1348. Rather, the non-moving party must set forth "'specific facts showing that there is a genuine issue for trial.'" Id. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)). The substantive law defines which facts are material. Liberty Lobby, 477 U.S. at 248, 106 S.Ct. 2505.
The court views all underlying facts in the light most favorable to the non-moving party. Martinez v. City of Los Angeles, 141 F.3d 1373, 1378 (9th Cir.1998) (citing Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S.Ct. 1348).
Although the non-moving party has the burden of persuasion, the party moving for summary judgment has the initial burden of showing the absence of a genuine issue of material fact. Metro Indus., Inc. v. Sammi Corp., 82 F.3d 839, 847 (9th Cir.1996). That burden is met by showing an absence of evidence to support the nonmoving party's case. Celotex Corp., 477 U.S. at 325, 106 S.Ct. 2548. The burden then shifts to the respondent to set forth specific facts demonstrating that there is a genuine issue for trial. Liberty Lobby, 477 U.S. at 250, 106 S.Ct. 2505. In meeting this burden, parties seeking to defeat summary judgment cannot rest upon allegations of denials of pleadings, but must demonstrate a genuine issue for trial. Brinson v. Linda Rose Joint Venture, 53 F.3d 1044, 1049 (9th Cir.1995). Under Rule 56(e), the adverse party must allege specific facts supported by affidavit that raise triable issues. Id. Affidavits that do not affirmatively demonstrate personal knowledge are insufficient. Keenan v. Allan, 91 F.3d 1275, 1278 (9th Cir.1996).

IV. DISCUSSION
Blaine County claims that summary judgment is appropriate because § 2 of the Voting Rights Act is unconstitutional. It bases this assertion on the theory that § 2 violates the Tenth and Eleventh Amendments by excessively interfering with a state's right to conduct its own elections.
The Voting Rights Act of 1965 was adopted via Congress' power under the § 5 enforcement provision of the Fourteenth *1149 Amendment. Initially, Congress designed the Act to remedy literacy testing, poll taxes, and other devices used to disenfranchise black voters in the mid-1960's. While the Act was somewhat effective, eligible black voters continued to vote less frequently than their white counterparts. Congress amended the Act in 1970 and 1975 to combat new tactics used to restrict minority voting in response to the 1965 legislation.
Prior to 1982 and after the United States Supreme Court's decision in City of Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), a plaintiff under § 2 was required to show discriminatory intent on the part of state actors in order to prevail. This standard was difficult to meet in most cases, thus limiting the effectiveness of the Voting Rights Act. In 1982, Congress amended the Act once again. This time lessening the burden for plaintiffs claiming discrimination. Instead of proving discriminatory intent, a plaintiff needed to merely demonstrate discriminatory results under the 1982 amendments to the Act.
The constitutionality of the Voting Rights Act has been unsuccessfully challenged many times, both before and after the 1982 amendments. The Supreme Court addressed the issue of whether the Voting Rights Act was an excessive application of congressional power and, therefore, encroached on areas reserved to the states in South Carolina v. Katzenbach, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). The Court held that the Voting Rights Act was an "appropriate means for carrying out Congress' constitutional responsibilities and [is] consonant with all other provisions of the Constitution." Id. at 308, 86 S.Ct. 803. In U.S. v. Marengo County Comm'n, 731 F.2d 1546 (11th Cir. 1984), cert. denied, 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984), the Eleventh Circuit ruled that the 1982 amendments imposing the results, rather than intent, standard was constitutional. Id. at 1556. Additionally, in Major v. Treen, 574 F.Supp. 325, 343 (E.D.La.1983), the United States District Court for the Eastern District of Louisiana upheld the constitutionality of the 1982 amendments.[2]
Congress is broadly empowered by § 2 of the Fifteenth Amendment to prohibit state action that, though itself does not violate § 1, but instead perpetuates the effects of past discrimination. City of Rome v. United States, 446 U.S. 156, 176, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980).
"Congress seeks to protect the core values of these amendments through a remedial scheme that invalidates election systems that, although constitutionally permissible, might debase the amendments' guarantees. Congressional power to adopt prophylactic measures to vindicate the purposes of the fourteenth and fifteenth amendments is unquestioned."
Jones v. City of Lubbock, 727 F.2d 364, 373 (5th Cir.1984). The Voting Rights Act seeks in part to remedy minority vote dilution created by state and local electoral systems. "We reject any assertion that the statute as amended applies only to formal barriers to access such as literacy or residency tests. The goal of the Voting Rights Act has always been to ensure an effective right of participation." Marengo County, 731 F.2d at 1556. In Jordan v. Winter, 604 F.Supp. 807, 812 (N.D.Miss. 1984), aff'd sub nom. Mississippi Republican Executive Comm. v. Brooks, 469 U.S. 1002, 105 S.Ct. 416, 83 L.Ed.2d 343 (1984), *1150 the court implemented a redistricting plan which addressed issues of racial bloc voting. The plaintiffs in that case established that voters in Mississippi voted for candidates on the basis of race. Id. "[B]lacks consistently lose elections in Mississippi because the majority voters choose their preferred candidates on the basis of race. We therefore find racial bloc voting operates to dilute black voting strength...." Id. at 812, 813; see also, Rogers v. Lodge, 458 U.S. 613, 623, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982).
Blaine County argues that the 1982 amendments to the Voting Rights Act are unconstitutional when applied to jurisdictions such as itself, where no historical specific evidence of voting discrimination has been identified or was relied upon in the legislative history of the 1982 amendments. The Supreme Court has previously held however, that such laws with national scope are valid exercises of Congressional authority. In Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272, (1970), the Supreme Court concluded that Congress had not exceeded its authority in enacting a five-year national ban on the use of qualification tests in both state and local elections. Id. at 154, 91 S.Ct. 260.
Blaine County claims that the Act is nevertheless unconstitutional in the wake of the recent Supreme Court decisions beginning with City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) and culminating with the recently decided Bd. of Tr. of the Univ. of Alabama v. Garrett, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). The holdings in these cases limited the application of Congress' enforcement power under the Thirteenth, Fourteenth, and Fifteenth Amendments. However, these cases are distinguishable from the case before this Court.
For a law to be a valid exercise of Congressional power under § 5 of the Fourteenth Amendment, "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." Boerne, 521 U.S. at 520, 117 S.Ct. 2157. This two-prong test, congruence and proportionality, has become the standard for evaluating laws passed under the enforcement provision of the Fourteenth Amendment.
Congruence refers to the relationship between the laws passed by Congress and the wrong Congress seeks to remedy. "While preventive rules are sometimes appropriate remedial measures, there must be a congruence between the means used and the ends to be achieved." Id. at 530, 117 S.Ct. 2157. The appropriateness of remedial measures must be considered in light of the evil presented. Katzenbach, 383 U.S. at 308, 86 S.Ct. 803. "Strong measures appropriate to address one harm may be an unwarranted response to another, lesser one." Id. at 334, 86 S.Ct. 803. Thus, the Court has established that while Congress may enact remedial laws to address Fourteenth Amendment violations, the laws must be closely related to the harms addressed.
Proportionality is the second component of the two-prong test. In the recent Supreme Court cases cited by Blaine County, the Court was careful to examine whether the enacted legislation extended beyond the identified discrimination to adversely affect others who had not been guilty of conduct with discriminatory results. The ultimate purpose of the two-prong analysis is to ensure that Congressional acts passed under the § 5 enforcement power of the Constitution are limited to remedial measures, rather than substantive law.
In Boerne, the Supreme Court considered whether the Religious Freedom Restoration Act (RFRA), which prohibited any law that had a substantial impact on the *1151 right of persons to practice their religion, was a constitutional application of the § 5 enforcement power. Boerne, 521 U.S. at 515, 516, 117 S.Ct. 2157. The Court held that it was not. Id. at 536, 117 S.Ct. 2157. The Court found that Congress had little factual basis for assessing the magnitude of the discriminatory conduct, thus making the showing of congruence impossible. Id. at 530, 117 S.Ct. 2157. Moreover, the RFRA could be broadly applied to limit actors who had never discriminated, thus failing to meet the proportionality prong of the constitutional test. Id. at 532, 117 S.Ct. 2157. The Court found the RFRA to be substantive, rather than remedial law, and thus an unconstitutional application of the § 5 power. Id.
The Court similarly found that Congress could not apply the Patent Remedy Act to the states in Florida Prepaid Postsecondary Expense Bd. v. Coll. Sav. Bank, 527 U.S. 627, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999). The Court held that such application was substantive legislation rather than enforcement. Id. at 647, 119 S.Ct. 2199. Again, Congress had little factual basis for identifying the wrong and had instituted a presumptively remedial scheme which made all states immediately open to suit in federal court for "all kinds of possible patent infringement and for an infinite duration." Id. at 647, 119 S.Ct. 2199. Thus, the Patent Remedy Act exceeded the enforcement powers granted to Congress under the Fourteenth Amendment. Id. The Court similarly invalidated other Congressional acts in Coll. Sav. Bank v. Florida Prepaid Postsecondary Education Expense Board, 527 U.S. 666, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999) (invalidating application of the Trademark Infringement Act against states), and Kimel v. Florida Board of Regents, 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (invalidating application of the Age Discrimination in Employment Act against states).
Blaine County also relies on the Supreme Court's holding in U.S. v. Morrison, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), which invalidated the Violence Against Women Act (VAWA). The Supreme Court in Morrison invalidated VAWA because it was directed not at states or state actors, but instead toward private conduct. Id. at 621, 120 S.Ct. 1740. The § 5 enforcement power deals only with Congress' enforcement against states, not against individuals. Id. While VAWA was directed at private conduct, the Voting Rights Act is directed at states and state actors and thus Blaine County's reliance on Morrison is misplaced. Although racial bloc voting giving rise to minority vote dilution can be a form of private discrimination, it is the perpetuation of such a system by state actors that runs afoul of the Voting Rights Act and the Constitution.
Most recently, the Supreme Court held that the Americans with Disabilities Act was an excessive application of § 5 enforcement power in Bd. of Tr. of the Univ. of Alabama v. Garrett, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001), 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866. Relying on prior equal protection precedent, the Court concluded that states were not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions towards the disabled had a rational basis. Id. at 972. Thus, legislation regarding special accommodations for the disabled would need to come from positive law and not through the enforcement power of § 5. Id. at 964. Moreover, Congress had not identified a history and pattern of unconstitutional employment discrimination by the states against the disabled because its investigation and legislative history fell short of suggesting a pattern of unconstitutional discrimination on which Fourteenth Amendment legislation was required to be based. Id. at 967. Even if such a pattern *1152 of discrimination were shown, however, the rights and remedies in the ADA were not congruent and proportional to the targeted violation given the ADA's sweeping requirements. Id.
The Voting Rights Act is distinguishable from the aforementioned Acts held unconstitutional by the Supreme Court in two fundamental respects. First, Congress did have a factual basis for adopting not only the Voting Rights Act, but also its subsequent amendments. When adopting the Voting Rights Act, Congress had before it an extensive record of voting discrimination against minorities. Katzenbach, 383 U.S. at 310-12, 86 S.Ct. 803. Even so, Congress need not make specific findings concerning the severity or pervasiveness of voting discrimination each and every time it seeks to redress a purported wrong. Mitchell, at 147, 91 S.Ct. 260; Fullilove v. Klutznick, 448 U.S. 448, 503, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (Powell, J. concurring). The fact that the Act was primarily intended to remedy discrimination against African Americans in the southern states in the 1960's does not make it any less proper to use as a remedy for discrimination against Native Americans today. There is ample evidence that American Indians have historically been the subject of discrimination in the area of voting. See, e.g., Little Thunder v. South Dakota, 518 F.2d 1253, (8th Cir.1975); Goodluck v. Apache County, 417 F.Supp. 13 (D.Ariz.1975); Yanito v. Barber, 348 F.Supp. 587 (D.Utah 1972); Klahr v. Williams, 339 F.Supp. 922 (D.Ariz.1972).
Moreover, the remedy here is proportional to the harm. First, as described above, the Supreme Court has affirmed Congressional authority to pass laws relating to voting discrimination that are national in scope. Second, the Voting Rights Act does not require that districts be drawn so that minorities are guaranteed representation. It merely requires that they be given an equal chance at electing minority representatives only after they have shown that discriminatory results are present as a result of suspect voting procedures. 42 U.S.C. § 1973 (1982). Thus, the Voting Rights Act satisfies the congruence and proportionality requirements for a valid exercise of § 5 power.
Finally, throughout the recent Supreme Court cases cited by the Blaine County, there exists an element missing that is present in this case. None of these recently decided Supreme Court cases addressed voting issues. This is significant in that equal opportunity for voting for all ethnic groups was a primary basis for the Fourteenth and Fifteenth Amendments. The Court finds Congress did not exceed its authority under the Civil War Amendments in crafting the Voting Rights Act which is designed to remedy the very harm of voting discrimination that the Amendments were adopted to prevent.

V. CONCLUSION
IT IS THEREFORE ORDERED that Defendant Blaine County's Motion for Summary Judgment (Docs. # 23, # 24 and # 25) is DENIED.
NOTES
[1] Results from the 2000 census have not thus far been provided to the Court.
[2] In its moving papers, Blaine County does not cite to any specific case finding that the 1982 amendments to the Voting Rights Act are unconstitutional. Nor is this Court aware of any such cases.